466 Mass. 63 (2013)                                    63

Commonwealth v. Charles; Commonwealth v. Milette; District Attorney v. Superior Court.

COMMONWEALTH vs. SHUBAR CHARLES.
COMMONWEALTH vs. HECTOR MILETTE.
DISTRICT ATTORNEY FOR THE EASTERN DISTRICT vs.
SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT.

Suffolk. May 9, 2013. - July 22, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Controlled Substances. Superior Court,* Special magistrate. *Practice, Criminal,*
Postconviction relief, Execution of sentence, Sentence, Plea. *Supreme
Judicial Court,* Superintendence of inferior courts.

This court concluded that in exceptional circumstances (here, allegations of
serious and far-reaching misconduct by a chemist at a State drug labora-
tory that gave rise to significant concerns of tainted convictions), a judge
of the Superior Court has the authority to allow a criminal defendant's mo-
tion to stay the execution of his sentence, then being served, pending
disposition of the defendant's motion for a new trial, but a special magistrate
appointed by the Chief Justice of the Superior Court pursuant to Mass. R.
Crim. P. 47 does not have such authority. [72-79]
This court concluded that a special magistrate appointed by the Chief Justice
of the Superior Court pursuant to Mass. R. Crim. P. 47 does not have the
authority to reconsider and allow a motion to stay the execution of a
criminal defendant's sentence where a judge of the Superior Court has
previously denied a motion to stay execution that was filed by the same
defendant. [83-85]
This court concluded that allegations of serious and far-reaching misconduct
by a chemist at a State drug laboratory have raised significant concerns
about the administration of justice in criminal cases where a defendant has
been convicted of a drug offense and the drugs at issue were analyzed at
that facility, and therefore, the legality of plea colloquy proceedings before
special magistrates appointed by the Chief Justice of the Superior Court
pursuant to Mass. R. Crim. P. 47 to review and resolve affected cases
presents a systemic concern that this court should resolve through the
exercise of its general superintendence powers under G. L. c. 211, § 3
[87-89]; further, this court concluded that a special magistrate has the
authority under rule 47 to conduct a guilty plea colloquy and to report
findings concerning such issues as the voluntariness of the proposed plea
and the factual basis for the plea to a presiding justice of the Superior
Court [89-91].

CIVIL ACTIONS commenced in the Supreme Judicial Court for

the county of Suffolk on February 14, February 21, and March 1, 2013.

The cases were reported by *Botsford*, J.

*Ronald DeRosa*, Assistant District Attorney (*Elin H. Graydon*, Assistant District Attorney, with him) for the Commonwealth & another.

*Beth Eisenberg*, Committee for Public Counsel Services (*Matthew R. Segal* with her) for Shubar Charles.

*Matthew R. Segal* (*Emma A. Anderson*, of New York, with him) for Hector Milette.

*Jennifer Grace Miller*, Assistant Attorney General, for Superior Court Department of the Trial Court.

The following submitted briefs for amici curiae:

*Joel Z. Eigerman* for Jewish Alliance for Law & Social Action & others.

*C. Samuel Sutter*, District Attorney, & *Eva Zelnick*, Assistant District Attorney, for District Attorney for the Bristol District.

*Ryan Schiff* & *Benjamin H. Keehn*, Committee for Public Counsel Services, & *Alex G. Philipson* for Committee for Public Counsel Services & another.

SPINA, J. In June, 2011, allegations of misconduct at the William A. Hinton State Laboratory Institute in Jamaica Plain (Hinton drug lab) surfaced regarding work performed by Annie Dookhan, a chemist who had been employed in the forensic drug laboratory since November, 2003. Following an internal review, the Department of Public Health launched a formal investigation of the matter in December, 2011. The investigation concluded that "Dookhan failed to follow [Hinton drug l]ab protocols for the transfer and documentation of samples for testing, and subsequently created a false record of said transfers." After being placed on paid administrative leave, Dookhan resigned from her position, effective March 9, 2012. A more extensive investigation of the Hinton drug lab was initiated in August, 2012, by the State police. As a result of this investigation, it has been alleged that, among other things, Dookhan deliberately and repeatedly falsified drug testing results, tampered with evidence, and forged signatures on documents. Although the full scope of Dookhan's purported misconduct is not yet

known, it has been estimated conservatively that, during her tenure, Dookhan worked on at least 34,000 cases. The investigation of misconduct at the Hinton drug lab remains ongoing.

The three cases now before us concern the validity of certain procedures that have been adopted by the Superior Court Department of the Trial Court (Superior Court) to handle postconviction matters in criminal cases where a defendant has been convicted of a drug offense and the drugs at issue were analyzed at the Hinton drug lab. In October, 2012, the Chief Justice of the Superior Court assigned specific judges in seven counties to preside over special "drug lab sessions" that would deal with these postconviction matters. The first round of hearings focused on incarcerated defendants who had filed motions to stay the execution of their sentences in cases where the lead offense was a violation of the Controlled Substances Act, G. L. c. 94C, and Dookhan was the primary or confirmatory chemist.[1] From October 15 to November 28, the judges presiding over the drug lab sessions held 589 hearings, placing an enormous burden on the Superior Court.

On November 9, 2012, this court issued an order to facilitate the expeditious handling of matters relating to the alleged

[1]The Department of Public Health's executive summary of the Hinton drug lab internal inquiry, dated November 13, 2012, includes descriptions of the forensic laboratory testing protocols and workflow. It states that the "primary" chemist is the person assigned a sample of seized drugs for testing. This individual is "responsible for conducting Category C analyses, as well as for preparing samples for confirmatory Category A tests," which are performed by a "secondary" chemist. Category C analyses include "color tests, microcrystalline analyses, and ultraviolet visualization. They have only moderate discriminatory power, and are not associated with data that can be memorialized with a[n] instrument-generated paper or computer trail and reviewed." Category A tests "utilize sophisticated instrumentation such as Mass Spectrometry, Infrared Spectroscopy, and Gas Chromatography, have high discriminatory power, and are used as confirmatory tests. They produce instrument-generated documentation of test results that may be reviewed by a second chemist or a lab supervisor to further ensure accuracy." The primary chemist completes a "Drug Powder Analysis Form," which includes "the samples' control number, the requesting agency, the initials of the analyst performing the test, the number of samples, a physical description of the sample, its gross and net weights, the number and types of test(s) performed, the test results and the dates of testing." In accordance with *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305 (2009), the primary chemist often is called as a witness when a certificate of drug analysis is introduced as evidence at trial.

66       466 Mass. 63 (2013)

Commonwealth *v.* Charles; Commonwealth *v.* Milette; District Attorney *v.* Superior Court.

misconduct at the Hinton drug lab. The order provided, in relevant part:

> "[A] Chief Justice of a Trial Court Department may assign for all purposes, including disposition, any post conviction motion in which a party seeks relief based on alleged misconduct at the Hinton [drug lab] to any judge of that Trial Court Department. The assigned judge may reassign the motion to the original trial judge where the interests of justice require."

On November 26, 2012, in accordance with the provisions of Mass. R. Crim. P. 47, 378 Mass. 923 (1979),[2] the Chief Justice of the Superior Court appointed five retired Superior Court judges as "Special Judicial Magistrate[s] of the Superior Court, to preside over criminal proceedings in connection with cases relating to the [Hinton drug lab]." These special magistrates were assigned to six counties, and the Chief Justice of the Superior Court issued to each one an "Order of Assignment" delineating his or her authority and responsibilities. It provides, in part:

> "[T]he Special Judicial Magistrate shall have the powers, duties, and authority to preside at arraignments, to set bail, to assign counsel, to supervise pretrial conferences, and to mark up motions for hearing. The Special Judicial Magistrate shall also have the power and authority to conduct hearings on post conviction motions, to issue orders regarding discovery, and other matters, and to make proposed findings and rulings to the Regional Administrative Justice. . . . Further, the Special Judicial Magistrate shall perform such other duties as may be authorized by order of the Superior Court."

---

[2]Rule 47 of the Massachusetts Rules of Criminal Procedure, 378 Mass. 923 (1979), states, in relevant part:

> "The Justices of the Superior Court may appoint special magistrates to preside over criminal proceedings in the Superior Court. Such special magistrates shall have the powers to preside at arraignments, to set bail, to assign counsel, to supervise pretrial conferences, to mark up pretrial motions for hearing, to make findings and report those findings and other issues to the presiding justice or Administrative Justice, and to perform such other duties as may be authorized by order of the Superior Court."

466 Mass. 63 (2013)                                           67

Commonwealth *v.* Charles; Commonwealth *v.* Milette; District Attorney *v.* Superior Court.

As of March 6, 2013, the special magistrates had conducted more than 900 hearings, a substantial number of which pertained to defendants' motions to stay the execution of their sentences.[3]

The three present cases originated in Essex County. Each arose as a consequence of the implementation of the procedures established by the Chief Justice of the Superior Court for handling postconviction matters in the special drug lab sessions. Following proceedings in the Superior Court with regard to each case, which will be discussed in greater depth in subsequent portions of this opinion, the Commonwealth filed petitions in the county court pursuant to G. L. c. 211, § 3, challenging those procedures. On March 13, 2013, a single justice held a hearing on the Commonwealth's petitions. She then reserved and reported three questions to the full bench:

> "1. Does a special magistrate appointed by the Chief Justice of the Superior Court pursuant to Mass. R. Crim. P. 47, or a judge of the Superior Court, have the authority to allow a defendant's motion to stay execution of his sentence, then being served, pending disposition of the defendant's motion for a new trial?
>
> "2. Does a special magistrate have the authority to reconsider and allow a motion to stay execution of a criminal defendant's sentence where a judge of the Superior Court has previously denied a motion to stay execution filed by the same defendant?
>
> "3. (a) Is it appropriate for this court to answer the question set forth in 3(b) below, regarding the validity of plea colloquies conducted by special magistrates, where, under the terms of the protocol established by the Superior Court, neither side can be required to submit over its objection to a plea colloquy conducted by a special magistrate, and where, to date, because of the Commonwealth's objections, all colloquies in Essex County have been conducted by judges and not by special magistrates?
>
> "(b) If the court answers the question in 3(a) in the af-

---

[3]Hearings on motions for a new trial pursuant to Mass. R. Crim. P. 30, as appearing in 435 Mass. 1501 (2001), have been delayed at the request of both prosecutors and defense counsel due to, among other things, discovery issues.

firmative, does such a special magistrate have the authority under Mass. R. Crim. P. 47 to conduct a guilty plea colloquy and to report findings concerning such issues as the voluntariness of the proposed plea and the factual basis for the plea to a presiding justice of the Superior Court?"[4]

We shall proceed to analyze and answer each question in the context of the individual case in which it arose.[5]

I

## Commonwealth *vs.* Shubar Charles

The essential facts are not disputed. On the evening of April 2, 2009, a former girl friend of Shubar Charles contacted the New Bedford police department to report that, while at her home for a birthday celebration, Charles had held a firearm to her face and threatened to kill her. The ensuing police investigation suggested that Charles could be located in Lynn. When officers from the Lynn police department converged on an apartment on North Common Street, tenants informed them that Charles had gone into a back bedroom and had been "waving around" a small handgun. Officers discovered Charles alone in the back bedroom. They searched him and found in his pants pocket twenty individual baggies of a white powdery substance that they believed to be cocaine. A further search of the bedroom uncovered, among other things, a loaded firearm. Charles was arrested and taken to the Lynn police station. During booking,

---

[4]On April 9, 2013, the single justice denied, without prejudice, a joint request by Shubar Charles and Hector Milette to stay the execution of their sentences pending the outcome of these cases.

[5]We acknowledge the amicus brief submitted in support of Charles and Milette by the Committee for Public Counsel Services and the Massachusetts Association of Criminal Defense Lawyers, with respect to the first reported question; the amicus brief submitted in support of the Commonwealth by the District Attorney for the Bristol District, with respect to all three reported questions; and the amicus brief filed in support of Charles and Milette, by the Jewish Alliance for Law and Social Action, Boston Workers Alliance, Community Change, Inc., the Criminal Justice Institute of Harvard Law School, the Lawyers' Committee for Civil Rights and Economic Justice, the Massachusetts Law Reform Institute, Melvin H. King, and the Union of Minority Neighborhoods, with respect to all three reported questions.

he was searched again, and officers found a single bullet in the pocket of the jacket that he was wearing.

On June 5, 2009, Charles was indicted on charges of possession of a class B controlled substance (cocaine) with intent to distribute, as a subsequent offense, G. L. c. 94C, § 32A (*b*); possession of a firearm without a firearm identification card, G. L. c. 269, § 10 (*h*); unlawful possession of ammunition, G. L. c. 269, § 10 (*h*); and possession of a firearm after having been convicted previously of three violent crimes or three serious drug offenses, G. L. c. 269, § 10G (*c*) (two counts). Dookhan was the primary chemist who analyzed the substance in the baggies; she was not involved in the examination of firearm evidence. On a certificate dated December 28, 2009, Dookhan certified that the substance was cocaine.

On October 18, 2010, Charles pleaded guilty to reduced charges of possession of a class B controlled substance with intent to distribute, G. L. c. 94C, § 32A (*a*); unlawful possession of ammunition, G. L. c. 269, § 10 (*h*); and unlawful possession of ammunition after having been convicted previously of one serious drug offense, G. L. c. 269, § 10G (*a*). As part of the plea bargain, the Commonwealth agreed to enter a nolle prosequi on the remaining offenses. Charles was sentenced to concurrent terms of from four to seven years in the State prison for his convictions of possession of a Class B substance with intent to distribute and being a felon in possession of ammunition; he was sentenced to a concurrent term of two years in the house of correction for his conviction of unlawful possession of ammunition.[6]

On December 13, 2012, Charles filed a motion to stay the execution of his sentences pursuant to Mass. R. Crim. P. 31,[7] as appearing in 454 Mass. 1501 (2009), which the Commonwealth

---

[6]Charles received 463 days of jail time credit pursuant to G. L. c. 279, § 33A. According to defense counsel, Charles completed service of the house of correction portion of his sentences as of April, 2013, and, with earned good time credit, he became eligible for parole on the State prison portion of his sentences in March, 2013.

[7]Rule 31 (a) of the Massachusetts Rules of Criminal Procedure, as appearing in 454 Mass. 1501 (2009), provides, in relevant part:

"If a sentence of imprisonment is imposed upon conviction of a crime, the entry of an appeal shall not stay the execution of the sentence un-

opposed. He then filed a motion for a new trial pursuant to Mass. R. Crim. P. 30, as appearing in 435 Mass. 1501 (2001), raising claims pertaining to the alleged misconduct at the Hinton drug lab. In his motion for a stay, Charles asserted that his motion for a new trial likely would be successful because (1) his pleas were not knowing and voluntary where he had relied on the work of Dookhan; (2) his due process rights were violated where the Commonwealth failed "to provide true and accurate discovery prior to his guilty plea[s];" and (3) the evidence relating to Dookhan's misconduct at the Hinton drug lab constituted "newly discovered exculpatory evidence." He further asserted that, if released, he would not present a security risk.

On January 31, 2013, a special magistrate held a hearing on Charles's motion to stay the execution of his sentences. Defense counsel claimed that but for the drug indictment, Charles would not have agreed to the guilty pleas because the evidence with respect to the drug charge was the strongest. Given that Dookhan was the primary chemist on the case, defense counsel argued that there was a "great likelihood" that Charles's motion for a new trial would be successful. Further, while acknowledging that Charles had a criminal history, defense counsel asserted that Charles was "a much different person [now]," and he outlined the positive steps that Charles planned to take if released. The special magistrate allowed Charles's motion to stay execution of his sentences, subject to enumerated conditions.[8] In support of his ruling, the special magistrate found that Dookhan was the primary chemist on the certificates of drug analysis, and that Charles already had served three years and nine months of his concurrent sentences, could live with family members in Lynn, and likely pleaded guilty to being a felon in possession of ammunition (one bullet) as the result of a plea deal on the drug charge.

---

less the judge imposing it or, pursuant to Mass. R. A. P. 6, [as appearing in 454 Mass. 1601 (2009),] a single justice of the court that will hear the appeal, determines in the exercise of discretion that execution of said sentence shall be stayed pending the determination of the appeal."

[8]Charles was required to post $5,000 cash bail, reside with his brother at a particular address in Lynn, abide by a curfew, wear a global positioning system (GPS) monitoring device, and report to the probation department on a weekly basis.

466 Mass. 63 (2013)                                                    71

Commonwealth *v.* Charles; Commonwealth *v.* Milette; District Attorney *v.* Superior Court.

On February 4, 2013, the Commonwealth filed an objection to the special magistrate's ruling, in accordance with the procedure set forth in the Order of Assignment.[9] The Regional Administrative Justice of the Superior Court stayed the order of the special magistrate. Then, on February 8, he held a hearing on the Commonwealth's objection. The Commonwealth argued that a trial judge has no authority to stay the execution of a defendant's sentence in the absence of a pending appeal except in extraordinary circumstances, and no such circumstances were present in this case. Further, the Order of Assignment did not confer on a special magistrate the power to stay the execution of a defendant's sentence. Finally, the Commonwealth asserted that Charles's motion for a new trial was not likely to be successful, and that he would be a security risk if released. After considering Charles's motion to stay the execution of his sentences de novo,[10] the judge allowed the motion, making all of the same findings as were made by the special magistrate and imposing additional conditions.[11]

On February 13, the Commonwealth filed with the judge a motion to stay his order, which was allowed, but only for two days. On February 14, the Commonwealth filed a petition in the county court pursuant to G. L. c. 211, § 3, seeking to extend the stay of the judge's order. In its petition, the Commonwealth challenged the authority of both the judge and the special

[9] The Order of Assignment provides, in relevant part:

"If any party objects to the findings or rulings of the Special Judicial Magistrate, it must notify the Special Judicial Magistrate, opposing counsel and the Regional Administrative Justice in writing within 48 hours after receipt of the proposed findings and rulings stating the grounds for the objection. If no objection to the proposed findings and rulings of the Special Judicial Magistrate is filed within three court days of when the Special Judicial Magistrate makes said findings and rulings, they shall be acted upon by the Regional Administrative Justice without further hearing."

[10] The Order of Assignment does not set forth a procedure to be followed by a judge once an objection to a special magistrate's findings or rulings is filed.

[11] Charles was required to refrain from using alcohol and unauthorized drugs, submit to random drug and alcohol tests, remain confined to his home (except for emergency medical care and court appearances), and consent to searches of his person, home, bedroom, and motor vehicle by law enforcement personnel.

72                                          466 Mass. 63 (2013)

Commonwealth *v.* Charles; Commonwealth *v.* Milette; District Attorney *v.* Superior Court.

magistrate to stay the execution of Charles's sentences prior to the disposition of his motion for a new trial, and asserted that the allowance of the motion to stay constituted an abuse of discretion. On February 15, a single justice allowed the Commonwealth's motion to extend the stay of the judge's order pending further order of the county court. On March 13, the single justice held a hearing on the Commonwealth's petition, after which she reserved and reported the three questions set forth at the beginning of this opinion.[12]

We turn our attention to the first of these questions, which arose from the circumstances presented in Charles's case, and consider whether a judge of the Superior Court, or a special magistrate appointed by the Chief Justice of the Superior Court pursuant to Mass. R. Crim. P. 47, has the authority to allow a defendant's motion to stay the execution of his sentence, then being served, pending disposition of the defendant's motion for a new trial. At the outset, the Commonwealth argues that a Superior Court judge does not have such authority because, pursuant to Mass. R. Crim. P. 31 (a), a stay of the execution of a defendant's sentence is permissible only at the judge's discretion where an appeal is pending, and no appeal is pending in this case. See note 7, *supra.* Although we agree with the Commonwealth's reading of rule 31, we conclude that, in accordance with *Commonwealth* v. *McLaughlin,* 431 Mass. 506, 520 (2000) (*McLaughlin*), quoting *Mariano* v. *Judge of Dist. Court of Cent. Berkshire,* 243 Mass. 90, 92 (1922), a judge has the inherent power to stay sentences for "exceptional reasons permitted by law."[13]

It has long been recognized that the inherent powers of courts are those that are "essential to the performance of their functions, to the maintenance of their authority, and to their capacity to determine the rights of parties according to law." *Blanken-*

[12]On May 17, 2013, this court issued, without opinion, an order in the present case setting forth the answer to the first reported question and directing the single justice to vacate her February 15 order, which had stayed the order of the judge dated February 13. On May 28, the single justice vacated her February 15 order.

[13]Pursuant to Mass. R. Crim. P. 30, if a judge grants a defendant's motion for a new trial, the judge has discretion to admit the defendant to bail pending a decision on the Commonwealth's appeal. Given that there has been no ruling yet on Charles's motion for a new trial, rule 30 is not applicable.

466 Mass. 63 (2013)                                                          73

Commonwealth *v.* Charles; Commonwealth *v.* Milette; District Attorney *v.* Superior Court.

*burg* v. *Commonwealth*, 260 Mass. 369, 373 (1927). See *Sheriff of Middlesex County* v. *Commissioner of Correction*, 383 Mass. 631, 636 (1981). See also *Crocker* v. *Justices of the Superior Court*, 208 Mass. 162, 179 (1911) (courts have inherent power "to do whatever may be done under the general principles of jurisprudence to insure to the citizen a fair trial, whenever his life, liberty, property or character is at stake"). Significantly, "[a]lthough inherent powers may be recognized by statute, they exist independently, because they 'directly affect[] the capacity of the judicial department to function' and cannot be nullified by the Legislature without violating art. 30 [of the Massachusetts Declaration of Rights]." *First Justice of the Bristol Div. of the Juvenile Court Dep't* v. *Clerk-Magistrate of the Bristol Div. of the Juvenile Court Dep't*, 438 Mass. 387, 397 (2003), quoting *Opinion of the Justices*, 279 Mass. 607, 613 (1932). "The very concept of inherent power 'carries with it the implication that its use is for occasions not provided for by established methods.' " *Commonwealth* v. *Boe*, 456 Mass. 337, 345 n.13 (2010), quoting *Brach* v. *Chief Justice of the Dist. Court Dep't*, 386 Mass. 528, 536 (1982).

Judges must exercise their inherent authority "as necessary to secure the full and effective administration of justice." *O'Coin's, Inc.* v. *Treasurer of the County of Worcester*, 362 Mass. 507, 514 (1972). See *State Realty Co. of Boston* v. *MacNeil Bros. Co.*, 358 Mass. 374, 379 (1970), quoting *Link* v. *Wabash R.R.*, 370 U.S. 626, 630-631 (1962) (inherent power enables courts "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases"). The boundaries of inherent judicial authority have been established on a case-by-case basis as challenges to the exercise of a particular power have arisen. See, e.g., *First Justice of the Bristol Div. of the Juvenile Court Dep't* v. *Clerk-Magistrate of the Bristol Div. of the Juvenile Court Dep't*, *supra* at 397-398, and cases cited. In *McLaughlin*, *supra* at 514-520, this court considered the inherent authority of a trial judge in the specific context of a stay of the execution of a defendant's sentence.

The defendant in *McLaughlin* was found guilty of involuntary manslaughter and arson of a dwelling house, and not guilty by reason of insanity of two charges of murder in the first degree;

74            466 Mass. 63 (2013)

Commonwealth *v.* Charles; Commonwealth *v.* Milette; District Attorney *v.* Superior Court.

the judge committed him to Bridgewater State Hospital and stayed the execution of sentence on his convictions until the date of his release from civil commitment. *Id.* at 507, 514. On appeal, this court concluded that the judge erred in staying the execution of sentence because no exceptional reasons justified the stay, and its effect was to extend the duration of the defendant's confinement for punitive purposes. *Id.* at 507, 518-520. We recognized that the plain language of Mass. R. Crim. P. 31 (a) "does not authorize a judge to stay execution of a penal sentence when an appeal is not pending," and we acknowledged that our jurisprudence is "largely silent on the question of the inherent power of trial judges to stay execution of sentence." *Id.* at 518. Although we declined to "delineate in detail the contours of trial judges' inherent power to stay execution of sentence," *id.* at 519-520, we said that "[t]he basic rule is clear. 'Sentences are to be executed forthwith *unless suspended or stayed for the exceptional reasons permitted by law*' " (emphasis added). *Id.* at 520, quoting *Mariano* v. *Judge of Dist. Court of Cent. Berkshire, supra.* See generally *Commonwealth* v. *Pagan,* 445 Mass. 315, 322 (2005) (inherent judicial powers are invoked sparingly, but their exercise is justified by exceptional circumstances).

Here, unlike in *McLaughlin,* exceptional circumstances warranted the judge's exercise of his inherent power to stay the execution of Charles's sentences pending the disposition of his motion for a new trial. The magnitude of the allegations of serious and far-reaching misconduct by Dookhan at the Hinton drug lab cannot be overstated. The alleged misconduct may have compromised thousands of cases. Dookhan's role as the primary chemist in Charles's case raises significant questions regarding the veracity of the drug analysis, which purportedly served as the basis for his guilty pleas, and may be dispositive of his motion for a new trial.[14] Given the ongoing investigation of misconduct at the Hinton drug lab and the uncertainty about when such investigation will be completed, the interest of justice is not served by the continued imprisonment of a defendant who may be entitled to a new trial. Cf. *Lavallee* v. *Justices in*

---

[14]We recognize that there is a dispute between the parties whether, in fact, the drug charge was the motivating factor behind Charles's guilty pleas. This matter can be resolved definitively when the motion for a new trial is considered.

*the Hampden Superior Court*, 442 Mass. 228, 246 (2004) (burden of "systemic lapse" in administration of justice "is not to be borne by defendants"). To the extent that Charles satisfies the necessary criteria for a stay of the execution of his sentences, a matter that will be discussed shortly, the allowance of a stay is properly within the judge's inherent authority.

With regard to special magistrates, the Commonwealth argues that they have no authority to allow a defendant's motion to stay the execution of his sentence, then being served, pending disposition of the defendant's motion for a new trial. We agree that special magistrates have no such authority, but we conclude that they are empowered to make proposed findings of fact and conclusions of law on a motion to stay the execution of sentence. Those findings and conclusions, in turn, shall be reviewed by a judge, who will make the ultimate decision whether to allow or deny the motion to stay.

Rule 47 of the Massachusetts Rules of Criminal Procedure permits the appointment of special magistrates to preside over certain criminal proceedings in the Superior Court. These special magistrates occupy a separate and distinct position from clerks of courts who are designated as magistrates pursuant to G. L. c. 221, § 62B. See Reporters' Notes to Rule 47, Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, at 1759 (LexisNexis 2012-2013). The powers of special magistrates are delineated in rule 47. They have the authority "to preside at arraignments, to set bail, to assign counsel, to supervise pretrial conferences, to mark up pretrial motions for hearing, to make findings and report those findings and other issues to the presiding justice or Administrative Justice, and to perform such other duties as may be authorized by order of the Superior Court." Mass. R. Crim. P. 47. The responsibilities of a special magistrate are "quasi-judicial" in nature. See Reporters' Notes to Rule 47, *supra*. Given their position and limited powers, special magistrates do not have inherent judicial authority akin to that which can be exercised by Superior Court judges.

Pursuant to each Order of Assignment issued by the Chief Justice of the Superior Court in accordance with rule 47, the five special magistrates were appointed "to preside over criminal proceedings in connection with cases relating to the [Hinton

drug lab]." In addition to the powers conferred on them by rule 47, the special magistrates also were authorized "to conduct hearings on post conviction motions, to issue orders regarding discovery, and other matters, and to make proposed findings and rulings to the Regional Administrative Justice." The special magistrates, in the first instance, serve a critically important role in addressing the extraordinary demands placed on the Superior Court by the Hinton drug lab cases. However, the Order of Assignment, when read in conjunction with rule 47, does not permit a special magistrate to stay the execution of a defendant's sentence.

Although somewhat more circumscribed, the role of a special magistrate appointed pursuant to Mass. R. Crim. P. 47 is similar in many respects to that of a master appointed pursuant to Mass. R. Civ. P. 53, as amended, 423 Mass. 1408 (1996). A master is "appointed by the court to hear evidence in connection with any action and report facts." Mass. R. Civ. P. 53 (a) (i), as amended, 386 Mass. 1237 (1982). With regard to a matter not tried before a jury, "the court shall accept the master's subsidiary findings of fact unless they are clearly erroneous, mutually inconsistent, unwarranted by the evidence before the master as a matter of law or are otherwise tainted by error of law." Mass. R. Civ. P. 53 (h) (1), as amended, 386 Mass. 1237 (1982). See *Berish* v. *Bornstein*, 437 Mass. 252, 268 (2002). See also *Pollock* v. *Marshall*, 391 Mass. 543, 554 & n.9 (1984). A court is to review the ultimate findings of fact by a master in light of the independent inferences that the court can draw from the subsidiary findings. See *id.* at 555. See also *Bishay* v. *Foreign Motors Inc.*, 416 Mass. 1, 12 (1993), quoting Mass. R. Civ. P. 53 (h) (1) ("The court may draw its own inferences from the master's subsidiary findings"). "To the extent that the master's ultimate findings are conclusions of law, they are subject to independent judicial review." *Pollock* v. *Marshall, supra*, citing *Lucey* v. *Hero Int'l Corp.*, 361 Mass. 569, 571 (1972). In our view, this scope of review is the appropriate one to be applied to the proposed findings and conclusions of a special magistrate who has heard a defendant's motion to stay the execution of his sentence. The judge then shall enter an order allowing or denying the stay.[15]

Whether considered by a special magistrate or a Superior

---

[15]If neither the Commonwealth nor a defendant objects to a special

Court judge, the factors that shall be evaluated in deciding whether to allow a defendant's motion for a stay of the execution of his sentence pending the disposition of a new trial motion are the same as those relating to a stay of execution of sentence pending appeal. The first factor is whether the defendant's motion for a new trial presents an issue that "offers some reasonable possibility of a successful decision." *Commonwealth v. Allen*, 378 Mass. 489, 498 (1979), quoting *Commonwealth v. Levin*, 7 Mass. App. Ct. 501, 504 (1979). See *Commonwealth v. Hodge (No. 1)*, 380 Mass. 851, 855 (1980). The second factor is whether the defendant's release poses a security risk. See *id.* Significant considerations include the defendant's "familial status, roots in the community, employment, prior criminal record, and general attitude and demeanor." *Id.* See *Commonwealth v. Levin, supra* at 505. These considerations, in turn, will inform the calculus regarding the possibility of the defendant's flight to avoid punishment, the potential danger posed by the defendant to any person or to the community, and the likelihood that the defendant will commit additional criminal acts while awaiting a decision on his new trial motion. See *Polk v. Commonwealth*, 461 Mass. 251, 253 (2012), citing *Commonwealth v. Hodge (No. 1), supra.*

In the context of a pending appeal, the practice of granting a stay of execution of sentence "is grounded in rudimentary notions of justice" because a "conviction may be reversible, but the time spent in prison is not." *Commonwealth v. Levin, supra* at 512-513. See *Commonwealth v. Hodge (No. 1), supra* at 855-856. This rationale is no less important here, notwithstanding the fact that there is no pending appeal. The allegations of misconduct at the Hinton drug lab have given rise to serious concerns about defendants who may be incarcerated as a consequence of tainted convictions. Thus, a defendant's motion to stay the execution of his sentence should be decided in an expeditious manner.[16]

In this case, we conclude that the judge did not abuse his

magistrate's ruling, then a judge need not hold another hearing prior to issuing a decision. However, if either party raises an objection, in conformity with the provisions of the Order of Assignment, see note 9, *supra*, then the judge shall hold a hearing on the matter.

[16]It goes without saying that the circumstances surrounding consideration of

discretion in allowing Charles's motion to stay the execution of his sentences. See *Commonwealth* v. *Cohen (No. 2)*, 456 Mass. 128, 132-133 (2010) (describing standard of review). First, it is not disputed that Dookhan was the primary chemist who analyzed the drugs that served as the basis for Charles's conviction of possession of cocaine with intent to distribute. The ongoing investigation of the Hinton drug lab purportedly has revealed that, among other alleged misconduct, Dookhan prepared false drug reports without doing any testing and intentionally contaminated drug samples to achieve desired results. To the extent that Charles's guilty pleas were based, in whole or in part, on drug analyses performed by Dookhan, his motion for a new trial has presented an issue that "offers some reasonable possibility of a successful decision." *Commonwealth* v. *Allen, supra*, quoting *Commonwealth* v. *Levin, supra* at 504. We caution that we are engaged in an interlocutory review focused only on a stay of execution of sentence. We offer no opinion on the ultimate merits of Charles's motion for a new trial, but simply determine that he has presented a colorable claim.

Second, defense counsel described to the judge how, notwithstanding Charles's criminal history, he had matured while incarcerated, having participated in various programs that were offered at the State prison, and he did not pose a security risk. Defense counsel informed the judge that, if released, Charles would live with his brother, and he would pursue two available employment opportunities as well as further education. The judge evaluated the possible security risk posed by Charles and

such motions in the special drug lab sessions are unique. As such, we are sailing into uncharted waters with regard to the appellate process. Notwithstanding the fact that each case relates to a stay of execution of a defendant's sentence pending the disposition of a motion for a new trial, rather than pending an appeal, we believe that Mass. R. A. P. 6, as appearing in 454 Mass. 1601 (2009), sets forth the proper procedure that is available after a judge acts on a motion for a stay. See Reporters' Notes to Rule 31, Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, at 1685 (LexisNexis 2012-2013). Typically, in all cases except those involving murder in the first degree, a single justice of the Appeals Court will hear the appeal. See *id.* We point out that a single justice may shorten or extend the time frame for responding to a motion to stay the execution of a defendant's sentence. See Mass. R. A. P. 6 (b) (2). Here, given the route by which this case came before the full bench, we are in the same position as the single justice to review the judge's order, and we do so in the interest of judicial economy.

466 Mass. 63 (2013)                                                79

Commonwealth *v.* Charles; Commonwealth *v.* Milette; District Attorney *v.* Superior Court.

addressed any uncertainties by imposing conditions that effectively would confine Charles to his home for the duration of his release. It is contrary to the interests of justice that Charles remain incarcerated while the nature and scope of the alleged misconduct at the Hinton drug lab are investigated and fully ascertained.

We answer the first reported question as follows: In exceptional circumstances, a judge of the Superior Court does have the authority to allow a defendant's motion to stay the execution of his sentence, then being served, pending disposition of the defendant's motion for a new trial, but a special magistrate appointed by the Chief Justice of the Superior Court pursuant to Mass. R. Crim. P. 47 does not have such authority.[17]

## II

### Commonwealth *vs.* Hector Milette

The essential facts are not disputed. On December 16, 2009, Hector Milette was indicted on charges of trafficking in one hundred grams or more of cocaine, G. L. c. 94C, § 32E (*b*) (3) (three counts); and trafficking in fourteen grams or more of cocaine, G. L. c. 94C, § 32E (*b*) (1). The charges arose from Milette's role as a middleman in the sale of purported drugs to a confidential informant on three separate dates in August, 2009, and from the seizure of a plastic bag containing a white substance found during a search of Milette's residence in Haverhill on October 20, 2009. Dookhan was the primary chemist who analyzed the substances from the three August sales. On two certificates dated November 12, 2009, and on a third certificate dated December 7, 2009, she certified that the substances were cocaine. Dookhan was not involved in the analysis of the substance discovered during the execution of a search warrant at Milette's home. That sample was examined separately by another chemist at the Hinton drug lab, who certified that it was cocaine.

---

[17]We anticipate that the Superior Court either has in place, or will put in place, a system for keeping track of the Hinton drug lab cases so that none falls through the proverbial cracks pending the disposition of defendants' motions for a new trial.

On May 9, 2011, Milette pleaded guilty to trafficking in twenty-eight grams or more of cocaine, G. L. c. 94C, § 32E (c) (2) (three counts); and possession of a class B controlled substance with intent to distribute, G. L. c. 94C, § 32A (a). Milette was sentenced to concurrent terms of from five years to five years and one day in the State prison for each of his three drug trafficking convictions; he was sentenced to a consecutive probationary term of three years for his conviction of possession of a class B substance with intent to distribute.[18]

On October 22, 2012, Milette filed a motion to stay the execution of his sentences pursuant to Mass. R. Crim. P. 31, which the Commonwealth opposed. He also filed a motion for a new trial pursuant to Mass. R. Crim. P. 30, raising claims pertaining to the alleged misconduct at the Hinton drug lab. In his motion for a stay, Milette asserted that his new trial motion likely would be successful because (1) Dookhan had signed three of the four certificates of drug analysis that served as the bases for his indictments; and (2) it was reasonably possible that the charges against him would be dismissed because Dookhan's misconduct had tainted the evidence in numerous cases that she had handled. Milette further asserted that he already had served nearly thirty-seven months of a sixty-month sentence, and that, if released, he would not present a security risk. In its opposition, the Commonwealth challenged, among other things, the authority of a trial judge to stay the execution of a defendant's sentence prior to the disposition of his motion for a new trial.

On November 13, a judge of the Superior Court held a hearing on Milette's motion to stay the execution of his sentences. Defense counsel argued that Milette had pleaded guilty to the drug charges "primarily because of the drug certifications," that he had put "great faith" in the analyses, and that now there were numerous questions concerning Dookhan's veracity and her actions during the testing procedures.[19] The judge denied Milette's motion to stay on the ground that the cocaine in Milette's possession had originated from a supplier whose drugs

---

[18]Milette received 561 days of jail time credit pursuant to G. L. c. 279, § 33A.

[19]Defense counsel did not present any argument at the hearing as to whether Milette, if released, would pose a security risk.

had been analyzed by a chemist unrelated to Dookhan and the Hinton drug lab.

On February 6, 2013, Milette filed a motion for reconsideration pursuant to Mass. R. Crim. P. 13 (a) (5), as appearing in 442 Mass. 1516 (2004), which was heard by a special magistrate on February 12.[20] Defense counsel asserted that, since the judge's ruling on November 13, the ongoing investigation of misconduct at the Hinton drug lab had revealed "criminal involvement" so "widespread" that Dookhan had been indicted in six counties on a variety of charges. Because of such misconduct, defense counsel continued, the interests of justice required a stay of the execution of Milette's sentences. Over the Commonwealth's objection, the special magistrate allowed Milette's motion for reconsideration and then stayed the execution of his sentences. The special magistrate found that Milette already had served two-thirds of his sentences, he had presented no disciplinary problems while incarcerated, he had secured a place to live if released, Dookhan had been the primary chemist on three of the four certificates of drug analysis, and Milette's role in the drug transactions had been that of a middleman. The special magistrate set bail at $2,000 cash, which Milette posted that day, and he imposed numerous conditions on Milette's release.[21] The special magistrate also declined to stay his order.

On February 13, the Commonwealth filed an objection to the special magistrate's ruling, in accordance with the procedure set forth in the Order of Assignment. That same day, the Regional Administrative Justice of the Superior Court modified Milette's conditions of release to include home confinement, except for emergency medical care and court appearances.

On February 27, the Regional Administrative Justice held a

---

[20]The special magistrate handled Milette's motion for reconsideration pursuant to the Order of Assignment that had been issued by the Chief Justice of the Superior Court on November 26, 2012. Based on a conversation he had with the judge who initially heard the motion, it was the special magistrate's understanding that he had the authority to decide the motion for reconsideration in order to "ease the burden on the sitting Judges as much as possible." The special magistrate further thought that if the Commonwealth was unhappy with his decision, then the matter would go back to the judge.

[21]Milette was required to submit to random drug and alcohol tests, abide by a curfew, wear a GPS monitoring device, and report to the probation department on a weekly basis.

hearing on the Commonwealth's objection. The Commonwealth argued that the special magistrate had erred in allowing Milette's motion for reconsideration because no significant change in circumstances had occurred since a judge denied Milette's motion to stay the execution of his sentences on November 13. Further, the special magistrate, who no longer was an active Associate Justice of the Superior Court, did not have the authority to reconsider a judge's ruling and order a stay, and, in any event, a stay of the execution of a defendant's sentence could not be entered where there was no pending appeal. Finally, the Commonwealth asserted that, even if the special magistrate did possess the requisite authority, Milette had failed to show that his motion for a new trial likely would be successful, and that he would not be a security risk if released.

In a written memorandum of decision, the second judge vacated the stay of execution of sentences entered by the special magistrate on February 12, and he ordered Milette back into custody to resume serving the remainder of his State prison sentences. The judge concluded that both he and the special magistrate had the authority to issue a stay of execution and to set conditions of release. Moreover, recognizing the extensive evidence that had come to light regarding Dookhan's malfeasance at the Hinton drug lab, the judge stated that such a change in circumstances since November 13 warranted reconsideration of a judge's initial denial of Milette's motion for a stay of the execution of his sentences. However, in light of the proceedings in Commonwealth vs. Charles, No. SJ-2013-0066, and the perceived absence of any meaningful difference between that case and this one, the judge declined to uphold the order of the special magistrate allowing Milette's motion for reconsideration and granting the stay.

Meanwhile, on February 21, the Commonwealth had filed a petition in the county court pursuant to G. L. c. 211, § 3, seeking to stay the order of the special magistrate.[22] In its petition, the Commonwealth requested clarification of the authority of both a judge and a special magistrate to stay the execution of a defendant's sentence pending the disposition of his motion for a

---

[22]Once the Regional Administrative Justice vacated the stay of execution of sentences issued by the special magistrate on February 12, the Commonwealth withdrew its request to stay the order of the special magistrate.

new trial, and challenged the authority of a special magistrate to reconsider a judge's ruling on such a motion to stay. On March 13, the single justice held a hearing on the Commonwealth's petition, after which she reserved and reported the three questions set forth at the beginning of this opinion.[23]

We turn our attention to the second of these questions, which arose from the circumstances presented in Milette's case, and examine whether a special magistrate has the authority to reconsider and allow a motion to stay the execution of a defendant's sentence where a judge of the Superior Court previously had denied the same motion.[24] The Commonwealth contends that a special magistrate has no such authority. We agree.

As a general matter, Massachusetts courts have recognized that "it is within the inherent authority of a trial judge to 'reconsider decisions made on the road to final judgment.'" *Herbert A. Sullivan, Inc.* v. *Utica Mut. Ins. Co.*, 439 Mass. 387, 401 (2003), quoting *Franchi* v. *Stella*, 42 Mass. App. Ct. 251, 258 (1997). See *Commonwealth* v. *Cronk*, 396 Mass. 194, 196 (1985) ("While the Massachusetts Rules of Criminal Procedure do not expressly permit a judge to rehear a matter, no policy prohibits reconsideration of an order or judgment in appropriate circumstances"). Although a judge is not obligated "to reconsider a case, an issue, or a question of fact or law, once decided, the power to do so remains in the court until final judgment or

---

[23]On May 16, 2013, the parties filed a joint motion (1) to stay Milette's request for a remand to the single justice of his motion to stay the execution of his sentences, and (2) to remand Milette's case to the Superior Court for consideration of his motion for a new trial. On May 17, this court issued an order giving a Superior Court judge approval, to the extent needed, to act on Milette's pending motion for a new trial and his proffered guilty pleas. On May 24, the Commonwealth filed a status report stating that Milette's motion for a new trial had been allowed by agreement on May 20. Milette then pleaded guilty to trafficking in fourteen grams or more of cocaine (three counts), and possession of a class B substance with intent to distribute. Milette was sentenced to concurrent terms of from three years to three years and one day for each of his three drug trafficking convictions, and these sentences were deemed served. He also was sentenced to a subsequent probationary term of three years, which included various conditions, for his conviction of possession of a class B substance with intent to distribute.

[24]To the extent that the Commonwealth also raises, in the context of this case, the issue of a special magistrate's authority to allow a defendant's motion to stay the execution of his sentence, our decision in Part I, *supra*, is dispositive.

decree." *Peterson* v. *Hopson*, 306 Mass. 597, 601-602 (1940), and cases cited. See *Commonwealth* v. *Gross*, 447 Mass. 691, 693 n.2 (2006), quoting *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 707 (1987), cert. denied, 485 U.S. 940 and 485 U.S. 962 (1988). The party filing a motion for reconsideration "should specify (1) 'changed circumstances' such as (a) newly discovered evidence or information, or (b) a development of relevant law; or (2) a particular and demonstrable error in the original ruling or decision." *Audubon Hill S. Condominium Ass'n* v. *Community Ass'n Underwriters of Am., Inc.*, 82 Mass. App. Ct. 461, 470 (2012). See *Barbosa* v. *Hopper Feeds, Inc.*, 404 Mass. 610, 622 (1989); *Peterson* v. *Hopson*, *supra* at 599-600, and cases cited. Whether to allow the motion is left to the judge's discretion. See *Audubon Hill S. Condominium Ass'n* v. *Community Ass'n Underwriters of Am., Inc.*, *supra*. "A judge should hesitate to undo his own work. . . . Still more should he hesitate to undo the work of another judge. . . . But until final judgment . . . there is no lack of power, and occasionally the power may properly be exercised." *King* v. *Globe Newspaper Co.*, *supra*, quoting *Peterson* v. *Hopson*, *supra* at 603 (citations omitted).

As we discussed in Part I, *supra*, neither the position nor the authority of a special magistrate is coextensive with that of a trial judge. The Order of Assignment, when read in conjunction with Mass. R. Crim. P. 47, does not permit a special magistrate to reconsider a judge's decision on a defendant's motion to stay the execution of his sentence. We recognize that, once a judge has ruled on such a motion, a change in circumstances may arise that would warrant a reevaluation of the original decision. Where modification of the original decision is in order, the judge shall determine the procedure to be followed and make the necessary ruling. In those instances when the judge's decision would benefit from an evidentiary hearing on the changed circumstances, a special magistrate is empowered to make proposed findings of fact and conclusions of law on the motion for reconsideration. Those findings and conclusions, in turn, shall be reviewed by a judge, who will make the ultimate determinations whether to allow or deny the motion for reconsideration and, then, whether to modify the original decision.

Here, we need not consider further the underlying merits of

the judge's decision on Milette's motion for reconsideration. Shortly after oral argument before this court, Milette's motion for a new trial was allowed, he pleaded guilty to various drug offenses, and he was sentenced on those convictions. See note 23, *supra*. The issue of Milette's motion for reconsideration now is moot because he no longer has a personal stake in its outcome. See *Commonwealth* v. *Dotson*, 462 Mass. 96, 98-99 (2012) (describing mootness doctrine).

We answer the second reported question, "No."

## III

### District Attorney for the Eastern District *vs.* Superior Court Department of the Trial Court

The essential facts are not disputed. Following the commencement of the special drug lab sessions, procedures were put in place in the Superior Court for the taking of guilty pleas after the allowance of a defendant's motion for a new trial. Pursuant to Mass. R. Crim. P. 47 and the Order of Assignment, special magistrates were authorized, in appropriate circumstances, to conduct guilty plea colloquies with defendants. Standardized written forms were prepared for use by the special magistrates in the taking of a defendant's guilty plea.[25]

In accordance with the Superior Court procedures, a defendant would appear before a special magistrate asking to change his plea to guilty of the charges against him. The special magistrate would inform the defendant that he had a right to appear before a Superior Court judge, who would conduct a plea colloquy by asking questions about the voluntariness of the defendant's decision and his understanding of the consequences of his guilty plea. The special magistrate also would inform the defendant that, as a special magistrate, he could conduct the

---

[25]One form sets forth the questions to be asked during the plea colloquy. A second form, to be signed by a defendant and his attorney, gives the defendant's consent to appear before a special magistrate for a plea colloquy, and confirms the defendant's understanding that the special magistrate will report his findings to a judge of the Superior Court. A third form, to be signed by the special magistrate, sets forth his findings on the defendant's decision to plead guilty, his report to the judge on the matter, and his recommendation that the judge accept the defendant's guilty plea and the proposed sentence.

plea colloquy, make findings regarding the defendant's decision to plead guilty, and report those findings to a judge, who then would conduct further proceedings in the case, including accepting or rejecting the proffered plea, and, if accepted, would impose sentence. At this juncture, the special magistrate would continue with a plea colloquy only with the defendant's written consent.[26] In giving his consent, the defendant also would acknowledge that he was satisfied that his attorney had provided representation in an effective and competent manner.

If the defendant consented to proceeding before a special magistrate, the special magistrate would conduct an oral colloquy to determine whether the defendant was entering his guilty plea voluntarily and with a full understanding of its consequences.[27] The special magistrate then would make specific findings, including whether (1) the defendant was under the influence of drugs or alcohol; (2) the defendant had reported that he was suffering from any mental impairment that would affect his ability to understand and participate in the proceedings; (3) the defendant's decision to plead guilty was the result of any threat, force, coercion, or promise, or was solely because he was guilty; (4) the defendant's decision to plead guilty was made after consultation with competent counsel; (5) the defendant was aware of the potential consequences of pleading guilty, including the obligation to provide a deoxyribonucleic acid sample to the State; (6) the defendant had been informed of the maximum penalties for each of the indictments to which he was pleading guilty; (7) there was a factual basis for the defendant's

---

[26]According to the Superior Court Department of the Trial Court, guilty plea colloquies are conducted by special magistrates only where *both* the defendant *and* the Commonwealth consent to such a procedure. Assuming that this is true, it appears to be a matter of practice, rather than a formal written requirement.

[27]In substantial measure, the questions set forth on the standardized form are similar to those typically asked by a trial judge when engaging a defendant in a guilty plea colloquy during a criminal session. See K.B. Smith, Criminal Practice and Procedure § 23.55 (3d ed. 2007) (sample plea colloquy). As specifically pertinent here, the special magistrate includes the following question, among others, in his colloquy: "Do you understand that there is an on-going criminal and civil investigation into the procedures and operations at the [Hinton drug lab], and that by pleading guilty, you are waiving your rights to any additional discovery regarding the Laboratory and waive all claims regarding alleged irregularities at the Laboratory?"

plea in the evidence presented by the Commonwealth; (8) the defendant fully understood that, if he was not a citizen of the United States, his conviction would have immigration consequences; (9) the defendant had knowingly, intelligently, and voluntarily waived all of his statutory and constitutional rights, as explained during the colloquy, and understood the consequences of his guilty plea; and (10) the defendant understood that there was an ongoing investigation at the Hinton drug lab, and that he was waiving all claims relating to alleged irregularities there. Finally, the special magistrate would report these findings to a Superior Court judge for further proceedings, and would recommend that the judge accept the defendant's guilty plea and the proposed sentence agreed to by the prosecutor and defense counsel during the colloquy. The defendant then would appear before the judge, who would review the findings and recommendation of the special magistrate, ask any relevant additional questions, accept the plea, and impose sentence.

The district attorney for the Eastern District (district attorney) has refused to participate in guilty plea proceedings before a special magistrate, insisting that such proceedings take place before a judge in order to assure the validity of the plea. Consequently, all of the plea proceedings in the special drug lab sessions held in Essex County have been conducted in this manner. However, special magistrates have conducted guilty plea colloquies in other counties.

On March 1, 2013, the district attorney filed a petition in the county court pursuant to G. L. c. 211, § 3, which the Superior Court opposed. The district attorney sought clarification of the validity of guilty plea proceedings conducted by special magistrates pursuant to the Order of Assignment. On March 13, the single justice held a hearing on the petition, after which she reserved and reported the three questions set forth at the beginning of this opinion.

We turn our attention to the third of these questions and consider (1) whether it is appropriate for this court to answer the question set forth in part (b) regarding the validity of plea colloquies conducted by special magistrates, where, under the terms of the protocol established by the Superior Court, neither side can be required to submit over its objection to a plea col-

loquy conducted by a special magistrate, and where, to date, all of the colloquies in Essex County have been conducted by judges and not by special magistrates; and (2) whether a special magistrate has the authority under Mass. R. Crim. P. 47 to conduct a guilty plea colloquy and report findings concerning such issues as the voluntariness of the proposed plea and the factual basis for the plea to a Superior Court judge. As to the first part of this question, the Superior Court asserts that where there have been no plea colloquies conducted by special magistrates in Essex County, there is no "actual controversy" for this court to resolve. Therefore, it follows that the issue presented in the second part of the question is not justiciable. We disagree.

General Laws c. 211, § 3, provides that "[t]he supreme judicial court shall have general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein if no other remedy is expressly provided . . . ." This court's superintendence powers are discretionary and will be exercised only in "the most exceptional circumstances." *Costarelli* v. *Commonwealth*, 374 Mass. 677, 679 (1978). See *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue*, 406 Mass. 701, 706 (1990). Generally speaking, a party seeking review under G. L. c. 211, § 3, must demonstrate both a violation of the party's substantive rights and the unavailability of adequate relief through the ordinary appellate process. See *id.*, quoting *Dunbrack* v. *Commonwealth*, 398 Mass. 502, 504 (1986). However, we have said that where "a systemic issue affecting the proper administration of the judiciary has been presented, resolution of the issue by this court is appropriate." *Simmons* v. *Clerk-Magistrate of the Boston Div. of the Hous. Court Dep't*, 448 Mass. 57, 61 (2006). See *Messing, Rudavsky & Weliky, P.C.* v. *President & Fellows of Harvard College*, 436 Mass. 347, 351 (2002). See also *A Juvenile* v. *Commonwealth (No. 1)*, 380 Mass. 552, 555-556 (1980) (resolving question of proper transfer practice between Boston Juvenile Court and Superior Court). In the past, we have exercised our general superintendence powers to resolve, among other things, "important issues with implications for the effective administration of justice" and "matter[s] of public interest that may cause further uncertainty within the

courts." *First Justice of the Bristol Div. of the Juvenile Court Dep't* v. *Clerk-Magistrate of the Bristol Div. of the Juvenile Court Dep't*, 438 Mass. 387, 391 (2003) (resolving internal dispute between members of judicial department). See *Bradford* v. *Knights*, 427 Mass. 748, 750-751 (1998) (determining that judges of Boston Municipal Court Department have inherent authority to rehear denials of applications for criminal complaints by clerks of that court).

It is undisputed that the allegations of serious and far-reaching misconduct by Dookhan at the Hinton drug lab have raised significant concerns about the administration of justice in criminal cases where a defendant has been convicted of a drug offense and the drugs at issue were analyzed at that facility. Although the full scope of the misconduct is not yet known, thousands of cases may have been compromised. In response to this burgeoning crisis, the Superior Court took action by developing and implementing procedures, across several counties, to review and resolve affected cases, including allowing special magistrates to conduct guilty plea colloquies. The allegations of misconduct at the Hinton drug lab, and the implications of such misconduct on defendants who have been convicted of drug offenses, present exceptional circumstances warranting this court's exercise of its superintendence powers. It is incumbent on us, at the early stages of this unfolding situation, to address uncertainties regarding the propriety of the procedures that have been implemented by the Superior Court. Notwithstanding the fact that special magistrates have not conducted guilty plea colloquies in Essex County, they have conducted such colloquies in other counties. We conclude that the legality of these proceedings presents a systemic concern that this court should resolve now through the exercise of its general superintendence powers under G. L. c. 211, § 3.

With regard to the second part of the third reported question, the district attorney contends that the procedure enabling special magistrates to conduct guilty plea colloquies in special drug lab sessions calls on special magistrates to act beyond the scope of their authority. Thus, in the district attorney's view, the validity of these guilty pleas has been rendered uncertain. We disagree and conclude that the procedure passes legal muster.

As we have discussed at some length, the Order of Assignment, in conjunction with Mass. R. Crim. P. 47, authorizes a special magistrate "to make proposed findings and rulings to the Regional Administrative Justice." Significantly, the special magistrate is neither accepting a defendant's guilty plea nor imposing a sentence. That is the ultimate function of the judge. See *Whitney* v. *Commonwealth*, 337 Mass. 722, 723 (1958) (sentence is judgment in criminal case). In the extraordinary circumstances presented here, the role of the special magistrate is to expedite the processing of an anticipated avalanche of cases through the special drug lab sessions by, preliminarily, making findings whether, among other things, a defendant has decided to plead guilty to the charges against him voluntarily and with a full understanding of the consequences of such action. See *Commonwealth* v. *Lopez*, 447 Mass. 625, 628 (2006), citing *Commonwealth* v. *Fernandes*, 390 Mass. 714, 715-718 (1984) ("To be effective, a guilty plea must be knowingly and voluntarily tendered directly from the defendant"). After doing so, the special magistrate simply reports his or her findings to a judge. The standardized written forms used in the Superior Court have been designed to assist the special magistrate in fulfilling his fact-finding responsibilities, to protect the defendant's constitutional and statutory rights, and to guarantee the proper administration of justice. Moreover, it is noteworthy that the individuals appointed to serve as special magistrates are retired Superior Court judges who are well acquainted with the content, scope, and importance of guilty plea colloquies, and are able to engage in "a real probe of the defendant's mind." *Commonwealth* v. *Foster*, 368 Mass. 100, 107 (1975). See *Commonwealth* v. *Sherman*, 451 Mass. 332, 338 (2008); *Commonwealth* v. *Fernandes*, *supra*.

"[W]hat is wanted from [a guilty plea] colloquy is the basic assurances that the defendant, represented by counsel, with whom he has consulted, is free of coercion or the like, understands the nature of the crime charged, knows the extent of his guilt, recognizes the basic penal consequences involved, and is aware that he can have a trial if he wants one" (footnotes omitted). *Commonwealth* v. *Nolan*, 19 Mass. App. Ct. 491, 498-499 (1985). The protocol implemented by the Superior Court provides these

necessary assurances. Once a judge receives the special magistrate's findings, the judge shall hold a hearing with the defendant and his counsel, adopt or revise the findings, accept or reject the plea, and, if the judge accepts the plea, impose sentence. In so doing, the judge shall engage the defendant and verify that the responses the defendant gave during the plea colloquy with the special magistrate remain accurate and true. The judge must be satisfied that the defendant's guilty plea was made intelligently and voluntarily, thereby confirming that the plea is a proper reflection of the defendant's guilt and a fair termination of the criminal proceedings against him.

We answer both parts of the third reported question, "Yes."

## IV

These matters are remanded to the single justice for further proceedings, consistent with this opinion, as appropriate.

*So ordered.*