Hines, J.
(dissenting). The petitioners and intervener (collectively, petitioners) are before this court once again seeking a global remedy for the more than 20,000 defendants whose convictions were tainted by Annie Dookhan’s unprecedented[1] and far-reaching misconduct at the William A. Hinton State Laboratory Institute. The court rejects a global remedy, adopting the view that “despite its considerable risks and burdens, case-by-case adjudication is the fairest and best alternative to resolve the cases potentially tainted by Dookhan’s misconduct.” Ante at 326. I disagree. Now, more than five years after Dookhan’s misconduct first came to light, the need to adopt a swift and sure remedy for the harm caused by her deceit presents itself with palpable urgency. The time has come to close the book on this scandal, once and for all, by adopting a global remedy. While I agree, as the court notes, that a global remedy is “strong medicine,” ante at 322, the continuing violation of the rights of the defendants affected by Dookhan’s misconduct and the damage to the integrity of our criminal justice system demand no less.
Contrary to the court’s assessment of the case-by-case procedure offered as the solution to the problem the court is obliged to solve, it is neither the fairest nor the best alternative for remedying the manifest injustice to the defendants caught up in the Dookhan scandal and for restoring the integrity to our criminal justice system. It fails as the “fairest” alternative because it flouts the guiding principle that “in the wake of government misconduct that has cast a shadow over the entire criminal justice system, it is most appropriate that the benefit of the remedy inure to the defendants.” Commonwealth v. Scott, 467 Mass. 336, 352 (2014), citing Lavallee v. Justices in the Hampden Superior Court, 442 Mass. 228, 246 (2004). It also fails as the “best” alternative because it is simply unworkable as a timely and effective mechanism for addressing the due process claims of the thousands of defendants now deemed to have been convicted on Dookhan’s tainted evidence. In short, the court’s solution is too little and too late. The only fitting end to this blight on the integrity of our *335 criminal justice system is vacatur and dismissal with prejudice of the convictions of all relevant Dookhan defendants. Therefore, I dissent.
The case for a global remedy. We have been here before. We acknowledged in Scott, 467 Mass. at 352, that Dookhan’s misconduct caused “a lapse of systemic magnitude in the criminal justice system.” Recognizing the ‘“particularly insidious” nature of Dookhan’s misconduct and that it ‘“belies reconstruction,” we adopted a conclusive presumption of egregious government misconduct as an accommodation to those defendants able to establish Dookhan’s role in producing the evidence upon which their conviction was based. Id. Later in Bridgeman v. District Attorney for the Suffolk Dist., 471 Mass. 465 (2015) (Bridgeman I), we declined the invitation to implement a global remedy for the thousands of cases affected by Dookhan’s misconduct ‘“at this time.” Id. at 487. Signaling a preference for a measured approach rather than the more drastic global remedy advocated by the petitioners, we noted that ‘“our decisions in Scott and [Commonwealth v. Charles, 466 Mass. 63 (2013)], have provided Dookhan defendants . .. with meaningful solutions for addressing concerns that have arisen as these defendants attempt to challenge their drug convictions.” Id.
Since Bridgeman I, however, Scott’s promise as a hedge against the wholesale violation of the due process rights of this class of defendants has been undermined by the sheer magnitude of the problem. Scott was decided without the benefit of the investigative reports establishing the scope of Dookhan’s misconduct.[2] The court reasonably assumed, therefore, that the jurisprudential shortcut to proving Dookhan’s misconduct would make a case-by-case approach workable. Because we now know the extent of Dookhan’s misconduct and that it has not yet been mitigated in any significant respect by the measures in Scott and Charles, that assumption is no longer valid. With a clearer eye on the scope of the problem, Scott’s characterization of Dookhan’s misconduct as a ‘“lapse of systemic magnitude” still stands as an apt factual and legal context for the petitioners’ claims. Scott, 467 Mass. at 352.
In this case, as in Scott, we are called upon to ‘“exercise our superintendence power [under G. L. c. 211, § 3,] to fashion a workable approach to motions to withdraw a guilty plea brought *336 by defendants affected by [Dookhan’s] misconduct.” Id. In this undertaking, the appropriate analytical framework is that articulated in Scott.[3] We noted that in fashioning a remedy for the ‘“systemic lapse” caused by Dookhan’s misconduct, “[w]e must account for the due process rights of defendants, the integrity of the criminal justice system, the efficient administration of justice in responding to such potentially broad-ranging misconduct, and the myriad public interests at stake.” Id. In balancing these factors as discussed below, I am persuaded that the case for a global remedy as advocated by the petitioners is compelling.
1. Due process rights. The due process rights at stake here, ‘“the opportunity to be heard ‘at a meaningful time and in a meaningful manner’ ” (citation omitted), Bridgeman I, 471 Mass. at 479, weigh heavily in Scott’s remedial calculus for two reasons: the serious and ongoing collateral consequences to the class of defendants convicted on the strength of Dookhan’s tainted evidence; and the necessity to avoid unnecessary delay beyond the four years that already have elapsed in providing these defendants a “meaningful” opportunity to establish prejudice from Dookhan’s misconduct. The court, ante at 320-321, paints a grim picture of how fives are upended by the serious collateral consequences of drug-related convictions. The picture is even more grim when one considers that many, if not most, of these defendants have already served their sentences.[4] They have paid their debt to society whether they owed one or not. The years spent incarcerated cannot be restored to these defendants, but a fair and just resolution can make amends. What due process requires then *337 is a remedy that is simple, sure, and final. That means a remedy that is uncomplicated by the myriad moving parts built into the court’s case-by-case model, free of the risk that further delay will prolong the only relief that realistically can be offered to defendants who have already served their sentences. This interpretation of what due process requires at this point in the effort to solve the Dookhan problem is supported by Scott and Bridgeman I.
In Bridgeman I, 471 Mass. at 479, the court declined to adopt a global remedy in part based on the “substantial efforts that are being made to deal with the impact of Dookhan’s misconduct.” With at least the prospect of a speedy resolution of the cases in which Dookhan was the primary or confirmatory chemist, the court was content to delay a more robust remedy to allow those efforts to accomplish their purpose.[5] Id. at 487. Here, however, we have come to an end point in assessing the impact of Scott and Charles in resolving the outstanding cases of this type. The district attorneys have identified 24,000 cases, more or less, that must be adjudicated on the prejudice prong of Scott. Thus, the scope of the current challenge is clear. The remedy, in accounting for defendants’ due process right to a prompt hearing, must have some reasonable prospect for immediate resolution of the 24,000 cases to avoid exacerbating the serious consequences of delay. I am not persuaded that the court’s case-by-case model meets this test in circumstances where the defendants’ due process rights are paramount.
2. Integrity of the criminal justice system. It is beyond dispute that Dookhan’s misconduct, the details of which have spread beyond the legal community,[6] has undermined public trust in the integrity of the criminal justice system. In a case such as this, coming before the court as a consequence of Dookhan’s serious corruption of our criminal justice system, the court’s task is not merely to decide the rights of the parties. The court must also act, within the boundaries of the law, to restore the public’s faith in the integrity of the courts. Unlike the right to counsel crisis in Lavallee, Dookhan’s misconduct is not a problem of the Legislature’s making. See Lavallee, 442 Mass. at 246. The duty to protect, and restore when necessary, the integrity of the criminal *338 justice system falls squarely upon the court.
With no clear sign from the court that it grasps the scope of the damage and the need for an approach that will eliminate “root and branch”[7] all of the attendant consequences, the public is left to wonder if the process by which a court imposes the sanction of a loss of liberty is fair and just.[8] Restoring the integrity of the criminal justice system requires that the court acknowledge and make amends for the shortcomings in a system that permitted Dookhan to “go rogue” for so long without detection.[9] Those shortcomings call into question the integrity of the entire criminal justice apparatus for gathering and reporting the evidence that juries rely on in deciding a defendant’s guilt or innocence. The perceived legitimacy of court-imposed restraints on a defendant’s liberty rises or falls on the integrity of the evidence. If the mistrust engendered by the individual and institutional failures that produced this scandal is allowed to remain, it will have far-reaching adverse consequences for the ability of our courts to maintain the public’s faith in the promise of equal justice for all. Because I am not persuaded that the case-by-case model adopted by the court can accomplish this essential purpose, this factor weighs in favor of the global remedy advocated by the petitioners.
3. Efficient administration of justice. There is no question that, despite the best efforts of the parties, thousands of defendants affected by Dookhan’s misconduct still languish without notice of their rights or even a realistic opportunity for redress. The four-year delay in the resolution of the cases tainted by Dookhan’s misconduct, as discussed above, adequately makes the point that the administration of justice has been anything but efficient. Yet, the court gives insufficient weight to this factor in adopting a case-by-case adjudication model.
*339 The efficacy of the court’s case-by-case model is at best questionable, both because it is unworkable and because it is likely to perpetuate further delay in providing a remedy to the thousands of defendants affected by Dookhan’s misconduct. Not only is it lacking in the ability to insure a speedy resolution of the 24,000 cases thus tainted, it is vulnerable to failure for several practical reasons: the reliance on voluntary cooperation of the district attorneys, and unrealistic timetables.
First, the success of phase one, which anticipates a substantial culling of the 24,000 cases, depends entirely on the voluntary cooperation of the district attorneys. Ante at 326. Understandably, the court has not asserted any authority to compel the dismissal of cases. See Commonwealth v. Pellegrini, 414 Mass. 402, 405 (1993) (“Prosecutors have broad discretion in determining whether to prosecute a case”). In this respect, the court’s model does not change the status quo: the district attorneys already have, and have had for the duration of the Dookhan crisis, the sole authority voluntarily to dismiss these cases. It is undisputed that the district attorneys have cooperated in identifying the defendants presumed to have been affected by Dookhan’s misconduct. However, without some basis for a reasonable belief that the district attorneys will follow through on the suggestion to dismiss thousands of cases with prejudice, the court does not inspire confidence in the success of the model.
Second, the timetable for the accomplishment of the various phases of the case-by-case model is unrealistic and unachievable. The court acknowledges that “substantial vetting” is required under phase one. Ante at 328. Yet, the district attorneys are given only ninety days to sift through the 24,000 cases that have been connected to Dookhan’s misconduct. If past is prologue, and taking into account the delays in getting to where we are now, accomplishing this task within the ninety-day window adopted for the court’s model is highly unlikely. Likewise, the thirty-day deadline in phase two for notice to the defendants whose cases will not be dismissed without prejudice is problematic for the same reason. To the extent that the time frames reflect a calculation that absolute compliance by the district attorneys and the Committee for Public Counsel Services will adequately accommodate the defendants’ due process rights, I have no confidence that the court’s faith in the practicality of the process will be rewarded. Unless the court is prepared to declare that reasonable requests for delay, even those based on the impracticality of the *340 timetable, will be denied, the more likely scenario is that further indeterminable delay will occur.
With the defendants’ due process right to a prompt hearing hanging in the balance, I cannot accept an untimely, and ultimately unworkable, case-by-case model as an appropriate resolution of the issue before us.
4. Other public interests. None of the other public interests at stake here warrants a disposition that prolongs a global remedy for the defendants who are presumed to have been victims of Dookhan’s misconduct. First, the likelihood that the vast majority of the defendants in the cases in which Dookhan was the primary or confirmatory chemist have completed their sentences mitigates the most compelling public interest at stake here: public safety. On the other side of the ledger, the serious and enduring collateral consequences of these convictions remain extant, resulting in manifest injustice to those defendants. The court weighs the rights of the defendants “against the necessity for preserving society’s interest in the administration of justice” and concludes that this factor favors the Commonwealth. Ante at 316, quoting Commonwealth v. Cronk, 396 Mass. 194, 198-199 (1985). In my view, this calculation is demonstrably erroneous. Society’s interest in the administration of justice is hardly served by a remedy that defers to the Commonwealth in deciding which, if any, cases are to be dismissed with prejudice and, in all other respects, depends on the defendants to opt into the scheme to benefit from the possibility that the case will be dismissed with prejudice. Ante at 326-332.
In sum, the Scott factors weigh heavily in favor of the defendants in the cases tainted by Dookhan’s misconduct. The scope and egregiousness of that misconduct, combined with the four-year delay in providing relief to the defendants affected by it, compels a global remedy. It is difficult to imagine a scenario where, faced with the detritus from a scandal of similar magnitude, a court would hesitate to order a global remedy. The question comes to mind, “If not now, when?”[10]

An exhaustive search of reported cases yielded not a single case involving misconduct comparable to that committed by Dookhan.

See ante at note 6.

Witliout clearly explaining why, the court strays from the analytical framework we adopted in Scott, relying instead on a self-selected set of “principles” explained in elaborate detail. Ante at 315-318. I agree that these principles are firmly rooted in our jurisprudence, but they are not necessarily dispositive of the issue presented here. Absent a reason to play by a different set of rules from that articulated in Scott, 467 Mass. at 352, and reiterated in Bridgeman I, 471 Mass. at 487, as an appropriate standard to apply in “fashionfing] a workable approach” to handling the cases in which Dookhan was the primary or confirmatory chemist, I would not spurn the analytical approach adopted in Scott. The problem here is the same as it was in Scott: the need to craft a fair and timely approach to the resolution of these cases.

An analysis conducted by a data science fellow at the American Civil Liberties Union Foundation of Massachusetts found that approximately sixty-two per cent of the convictions in the cases tainted by Dookhan’s misconduct were for possession only and that about ninety-one per cent of these cases were resolved in the District Court. These statistics support the assumption that most defendants have completed their' sentences.

The court observed that “[o]ur decision . . . will go a long way in resolving additional concerns that have surfaced and in moving these cases forward towards resolution.” Bridgeman I, 471 Mass. at 487.

See, e.g., Jackman, When a State’s Drug Chemist Lies for Years, Should All Her Cases Be Thrown Out?, Wash. Post, Sept. 29, 2016.

See Green v. County Sch. Bd., 391 U.S. 430, 437-438 (1968) (using phrase to describe obligation to dismantle school segregation fourteen years after command to do so in Brown v. Board of Educ., 347 U.S. 483 [1954]).

Over the years, the racial impact of our sentencing practices have come under scrutiny. See e.g.. The Sentencing Project, The Color of Justice: Racial and Ethnic Disparity in State Prisons, at 3, 5, 7-8 & n.13, 16-18 (2016). Although racial bias has not been documented, members of the public, especially those in the communities of color, rarely parse such reports in search of the real reason for disparate impact.

“Dookhan’s consistently high testing volumes should have been a clear indication that a more thorough analysis and review of her work was needed.” See Scott, 467 Mass. at 340.

C. Taylor, Sayings of the Jewish Fathers 7 (2d ed. 1897) (quoting Hillel the Elder).