NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12926

COMMITTEE FOR PUBLIC COUNSEL SERVICES & another[1] vs.  CHIEF
JUSTICE OF THE TRIAL COURT & others.[2]


Suffolk.     March 31, 2020. - April 3, 2020.

Present:  Gants, C.J., Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.


Committee for Public Counsel Services.  Chief Justice of the
    Trial Court.  Commissioner of Correction.  Sheriff.
    Parole.  Pretrial Detention.  Practice, Criminal, Sentence,
    Parole.



    Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on March 24, 2020.

    The case was reported by Budd, J.


    Matthew R. Segal (Jessie J. Rossman also present) for
Massachusetts Association of Criminal Defense Lawyers.
    Rebecca A. Jacobstein, Committee for Public Counsel
Services (Benjamin H. Keehn, Committee for Public Counsel

_____

    [1] Massachusetts Association of Criminal Defense Lawyers.

    [2] Department of Correction; parole board; Attorney General;
district attorneys for the Berkshire, Bristol, Cape and Islands,
eastern, Hampden, middle, Norfolk, northern, northwestern,
Plymouth, and Suffolk districts; and fourteen sheriffs'
departments.

Services, also present) for Committee for Public Counsel Services.

Eric A. Haskell, Assistant Attorney General (David C. Kravitz & Mindy S. Klenoff, Assistant Attorneys General, also present) for the Attorney General.

Daniel P. Sullivan for Chief Justice of the Trial Court.

Charles W. Anderson, Jr., for Department of Correction.

Gloriann Moroney for parole board.

Donna Jalbert Patalano, Assistant District Attorney, for district attorney for the Suffolk district.

Thomas D. Ralph, Assistant District Attorney (Marian T. Ryan, District Attorney, also present) for district attorney for the northern district & others.

Jane A. Sullivan, Assistant District Attorney (Elizabeth Dunphy Farris, Assistant District Attorney, also present) for the district attorney for the middle district & others.

Robert W. Harnais (Dan V. Bair, II, also present) for fourteen sheriff's departments.

Andrea Harrington, District Attorney for the Berkshire District, was present but did not argue.

Robert A. Jones & Joshua S. Levy, for the special master, were present but did not argue.

The following submitted briefs for amici curiae:

Katharine Naples-Mitchell for Mary T. Bassett & others.

Ruth Greenberg for Joseph Buckman & others.

Max Bauer for Dominick Donovan & others.

Liam T. Lowney, pro se.

Michael Cox, pro se.

Andrea James, Joneisha James, Stacey Borden, Robert Williams, Suzanne Gray, Michael Gray, Kathleen Mahan, Adelcia Miller, Damaris Muhammed, Brooke Hadley, Reyna M. Ramirez, Lauren Petit, Khadejah Al-Rijleh, Casandra Scarlet, Erika N., Paige Scott, Aaron Bray, Nana Yankah, Marsophia S. Ducheine, L.B., L.M., J.C., Lor Holmes, J.D., W.H., K.L., S.P., Joan Hunter, R.R., T.B., J.G., Selena Williams, Keondra Jean, J.B., Jude Glaubman, Nicole Sadler, Mallory Hanora, Jurrell Laronal, Annette Bartley, Fernando Phillips, Miles McKinney, Carlos R., & Ayana Aubourg, pro se.

Leon Smith for Citizens for Juvenile Justice.

Elizabeth Matos, James Pingeon, Bonita Tenneriello, & Jesse White for Prisoners' Legal Services of Massachusetts.

Phillip Kassel, Jennifer Honig, Coco Holbrook, & Caitlin Parton for Mental Health Legal Advisors Committee.

Christine M. Netski, Meredith Shih, David M. Siegel, & Martin F. Murphy for Boston Bar Association.

Jessica L. LaClair for Jose Rivera.

GAZIANO, J.   The 2020 COVID-19 pandemic has created enormous challenges for every aspect of our communities.  While scientists are racing to discover whether any existing drugs can help to treat the virus and improve outcomes for critically ill patients, and others are working at top speed to develop a vaccine, currently there is no cure and no vaccine.  Health care workers on the frontlines of the epidemic are coming down with the virus in much higher percentages than others, while surgical masks and other basic protective equipment are in short supply, and hospitals with already close-to-capacity intensive care unit beds confront the possibility of inadequate resources to care for critically ill patients, such as lack of needed ventilators.  Everyday life is heavily disrupted; most businesses, schools, and houses of worship are closed,[3] while grocers, pharmacies, and delivery services stretch to provide essential services to meet basic needs, and families without paychecks worry about how to meet those needs.  The Centers For Disease Control (CDC) guidelines recommend that, to avoid exposure, individuals limit contact with others, maintain a distance of at least six feet from other individuals if they are together, engage in frequent

---

[3] See Order Extending the Closure of Certain Workplaces and the Prohibition of Gatherings of More than 10 People, COVID-19 Order 21 (Mar. 31, 2020), https://www.mass.gov/doc/march-31-2020-essential-services-extension-order [https://perma.cc/SU87-GTAV].

handwashing, and clean and disinfect frequently touched surfaces daily in order to "flatten the curve," i.e., to reduce the number of cases the beleaguered health care system must treat at any one time.

On March 10, 2020, the Governor declared a state of emergency to support the Commonwealth's response to the threat of COVID-19.  On March 11, 2020, the World Health Organization formally declared the expanding spread of the COVID-19 virus a global pandemic.  Since then, infections have spread alarmingly, rapidly, and at an increasing rate, both in Massachusetts and throughout the world.  In an attempt to mitigate the spread of the disease, the Governor has imposed strict restrictions on many aspects of everyday life, including closing business and schools and stringently restricting public and private gatherings.  In the week between the filing of this petition and oral argument, confirmed cases in the Commonwealth increased more than eight-fold, from 777 cases to 6,620 cases.[4]

---

[4] Of course, during that same period, the number of people tested also has increased exponentially, as more laboratories have begun processing tests.  For example, in one day, March 26, 2020, 5,570 more tests were processed by the Department of Public Health than had been processed the previous day.  Prior to that, between March 23 and 24, the number of residents tested doubled in two days, from 6,004 to 13,749.  According to the Department of Public Health, more than 46,000 people in the Commonwealth had been tested as of March 31, 2020, resulting in 6,620 positive tests.

Pursuant to its supervisory authority, this court has issued a series of orders with respect to court proceedings, new filings, and trials, designed to "protect the public health by reducing the risk of exposure to the virus and slowing the spread of the disease."  As the health crisis has deepened, we have been forced to limit physical access to our court houses to address only "emergency matters that cannot be resolved through a videoconference or telephonic hearing, either because such a hearing is not practicable or because it would be inconsistent with the protections of constitutional rights," and have directed each trial court department to issue a standing order to determine what constitutes an emergency matter.  Each trial court department subsequently has done so.   We have emphasized, as well, that, "[i]n criminal cases, where appropriate, a defendant may ask the court for reconsideration of bail or conditions of release."

The petitioners, the Committee for Public Counsel Services (CPCS) and the Massachusetts Association of Criminal Defense Lawyers (MACDL), bring our focus to the situation with respect to COVID-19 confronting individuals who are detained in jails and houses of correction pending trial, and individuals who have been convicted and are serving a sentence of incarceration in the Commonwealth.  To allow the physical separation of individuals recommended by the CDC, the petitioners seek the

release to the community of as many individuals as possible as expeditiously as possible, indeed, on the day of argument in this case, according to one of them.  They offer a number of different legal theories under which a broad-scale release might be accomplished.

We conclude that the risks inherent in the COVID-19 pandemic constitute a changed circumstance within the meaning of G. L. c. 276, § 58, tenth par., and the provisions of G. L. c. 276, § [5]57.  To decrease exposure to COVID-19 within correctional institutions, any individual who is not being held without bail under G. L. c. 276, § 58A, and who has not been charged with an excluded offense (i.e., a violent or serious offense enumerated in Appendix A to this opinion) is entitled to a rebuttable presumption of release.  The individual shall be ordered released pending trial on his or her own recognizance, without surety,[6] unless an unreasonable danger to the community

---

[5] The petitioners further request that this court vacate all bench warrants and order the trial courts to cease issuing new bench warrants; suspend all conditions of probation that would violate the CDC's recommended physical distancing; and vacate probation orders that would require immediate detention.  Based on the record and the affidavits before us, which suggest that actions already are happening to the extent consistent with public safety, we decline to order further relief.

[6] Conditions of release may be imposed, consistent with current limitations on probation supervision and global positioning system monitoring restrictions.

would result, or the individual presents a very high risk of flight.

The special master previously appointed by this court in conjunction with this case will work at the county level with each relevant court to facilitate these hearings.[7]  The sheriffs of each county shall provide the special master daily census reports for each correctional institution, and the special master shall file weekly reports with this court, as detailed in Appendix B to this opinion, so that the court will be better positioned to respond to further changes in this rapidly-evolving situation.  In addition, the Department of Correction (DOC) shall furnish the special master daily reports of inmate counts and rates of COVID-19 cases at each facility, as explained in Appendix B.

With respect to those individuals who are currently serving sentences of incarceration, absent a finding of a constitutional violation, our superintendence power is limited.  Those who have been serving sentences for less than sixty days may move to have their sentences revised or revoked under Mass. R. Crim. P. 29, as appearing in 474 Mass. 1503 (2016) (Rule 29).  Those who are

---

[7] We acknowledge the extraordinary efforts of the special master, Brien T. O'Connor, who, together with his colleagues at Ropes and Gray, LLP, already has worked tirelessly with the parties to draft a report and recommendation for our consideration prior to argument in this case.

pursuing appellate proceedings or a motion for a new trial may seek a stay of execution of sentence pursuant to Mass. R. A. P. 6, as appearing in 481 Mass. 1608 (2019). See Commonwealth v. Charles, 466 Mass. 63, 83 (2013). Where there is no constitutional violation, however, art. 30 of the Massachusetts Declaration of Rights precludes the judiciary from using its authority under Rule 29 to revise and revoke sentences in a manner that would usurp the authority of the executive branch. Removing any limitation on the time in which a motion to revise and revoke a sentence may be brought, however, would do precisely that. See Commonwealth v. McCulloch, 450 Mass. 483, 488 (2008), quoting Commonwealth v. McGuinness, 421 Mass. 472, 476 n.4 (1995) ("A judge may not interfere with the executive function of the parole board by using postconviction evidence in an order to revise and revoke").

To afford relief to as many incarcerated individuals as possible, the DOC and the parole board are urged to work with the special master to expedite parole hearings, to expedite the issuance of parole permits to those who have been granted parole, to determine which individuals nearing completion of their sentences could be released on time served, and to identify other classes of inmates who might be able to be

released by agreement of the parties, as well as expediting petitions for compassionate release.[8]

As the petitioners have argued, and the respondents agree, if the virus becomes widespread within correctional facilities in the Commonwealth, there could be questions of violations of the Eighth and Fourteenth Amendments to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights; nonetheless, at this time, the petitioners themselves clarified in their reply brief and at oral argument that they are not raising such claims.

1.  Background.  a.  COVID-19 in jails and prisons.  All parties agree that, for several reasons, correctional institutions face unique difficulties in keeping their populations safe during this pandemic.  First, confined, enclosed environments increase transmissibility.  Maintaining adequate physical distance, i.e., maintaining six feet of distance between oneself and others, may be nearly impossible in prisons and jails.  Second, proper sanitation is also a challenge; the petitioners have submitted affidavits from

---

[8] We acknowledge the amicus letters of the Boston chapter of Black and Pink, Joseph Buckman and others, Citizens for Juvenile Justice, Dominick Donovan and others, the families of certain incarcerated loved ones, Massachusetts Office for Victim Assistance, Mental Health Legal Advisors Committee, Prisoners Legal Services, certain public health professionals, and Jose Rivera.

Department of Public Health (DPH) officials stating that, during recent routine inspections of Massachusetts correctional institutions (prior to the declaration of emergency), DPH inspectors discovered a concerning number of repeat environmental health violations.

Finally, while many people who contract COVID-19 are able to recover without the need for hospitalization, those who become seriously ill from the virus may require hospitalization, intensive treatment, and ventilator support. Severe cases are most likely to occur among the elderly and those with underlying medical conditions. Those in prisons and jails have an increased prevalence, relative to the general population, of underlying conditions that can make the virus more deadly. The DOC and the petitioners agree that hundreds of those incarcerated in the Commonwealth suffer from chronic diseases, and nearly 1,000 incarcerated individuals are over sixty years of age.

Experts warn that an outbreak in correctional institutions has broader implications for the Commonwealth's collective efforts to fight the pandemic. First, the DOC has limited capacity to offer the sort of specialized medical interventions necessary in a severe case of COVID-19. Thus, as seriously ill individuals are transferred from correctional institutions to outside hospitals, any outbreak in a correctional institution

will further burden the broader health care system that is already at risk of being overwhelmed.  Second, correctional, medical, and other staff enter and leave correctional institutions every day.  Should there be a high concentration of cases, those workers risk bringing infections home to their families and broader communities.

b.  Response to COVID-19 by courts and correctional institutions.  In response to the COVID-19 pandemic, and pursuant to orders of this court, the Superior Courts, the District Courts, the Boston Municipal Court, and the Juvenile Courts remain open for in-person proceedings only for emergency matters that cannot be resolved remotely.[9]  The courts are deciding motions related to COVID-19, including motions for release and motions for bail reduction, via remote hearings or based on the pleadings and without argument.[10]

---

[9] See Superior Court Standing Order 3-20 (Mar. 17, 2020); District Court Standing Order 2-20 (Mar. 18, 2020); Boston Municipal Court Standing Order 3-20; Juvenile Court Standing Order 3-20 (Mar. 25, 2020).  These emergency matters include arraignments.

[10] The Superior Court has reported to this court that, as of March 25, 2020, fifty-one such motions were pending, twenty-eight were denied, and nineteen were allowed in part or in full. The Juvenile Court received twenty-five motions for release or bail reduction between March 14 and March 25.  As of March 27, 2020, ten had been allowed, five had been denied, and ten were pending.

c. Commonwealth's response to COVID-19 crisis. The district attorneys have taken various proactive steps in response to COVID-19 to reduce the incarcerated population. The district attorneys for the Suffolk, northern, and northwestern districts have sought to identify detainees and inmates whom they believe would be appropriate for release. The district attorney for the Berkshire district notes that her office has sought unsuccessfully from the sheriff in Berkshire County census information necessary in order to identify appropriate candidates for release.

According to affidavits by the DOC and the various sheriffs' offices that operate correctional facilities, they have enacted screening procedures for all individuals entering these facilities. Employees with symptoms or positive test results are instructed to self-quarantine at home. New inmates and detainees also are screened for symptoms of COVID-19; those without symptoms are quarantined for fourteen days, and those with symptoms are isolated.

Individual correctional institutions also have restricted access to the facility only to essential staff. General visitation is suspended,[11] and transfers among facilities have

---

[11] Most correctional facilities have offered limited free telephone calls as a replacement to visits by family and friends.

been restricted or completely suspended.  Group programming has been curtailed, and scheduling changes within facilities have been enacted to reduce the number of individuals simultaneously occupying shared spaces.

The availability of hygiene products also has been increased.  The DOC, the Attorney General, and the sheriffs report that bar soap has been made available to all inmates and detainees without charge.  Hand sanitizer has been made available in many locations.  Inmates and detainees have been instructed on techniques to reduce the spread of COVID-19.  Personal protective equipment, including masks, gowns, gloves, and goggles, are available to staff in correctional facilities.

All facilities are below their maximum capacities, based on "operational capacity" as designated by the DOC.[12]  The prison system as a whole is at seventy-three per cent capacity; the most crowded facility is the North Central Correctional

---

[12] "Operational capacity" differs from "design capacity." Operational capacity is based on guidelines issued by the Association of State Correctional Administrators.  Design capacity is measured by the DOC and reported upon by the Governor quarterly, pursuant to St. 1985, c. 799, § 21.  See, e.g., Governor, Quarterly Report on the Status of Prison Capacity, Second Quarter 2019 (July 2019), https://archives.lib .state.ma.us/bitstream/handle/2452/807941/on1124679772-2019-2.pdf?sequence=1&isAllowed=y [https://perma.cc/AL5Z-67QT].

Institution, at ninety-five per cent of capacity.[13]  Jails and houses of correction are operating, on the whole, at fifty-six per cent capacity.[14]  The Norfolk County house of correction, at ninety-six per cent occupancy, is the closest to capacity.

As of April 1, 2020, there were three correctional facilities with confirmed cases of COVID-19 among inmates; the majority were at the Massachusetts Treatment Center (treatment center).  Seventeen members of the treatment center's population, one inmate at another DOC facility, two inmates who had been in close contact at a county jail, and three staff

---

[13] All prisons except the Souza-Baranowski Correctional Center, which houses largely inmates serving life sentences, currently are operating at above fifty per cent of capacity.

Occupancy rates in men's prisons are as follows: Massachusetts Correctional Institution (MCI), Cedar Junction (maximum security), 64%; Souza-Baranowski Correctional Center, 41%; Massachusetts Treatment Center, 84%; MCI, Cedar Junction, 86%; MCI, Concord, 78%; MCI, Norfolk, 85%; MCI, Shirley, 89%; North Central Correctional Institution, Gardner, 95%; Old Colony Correctional Center (OCCC), 92%; Shattuck Correctional Unit, 79%; State Hospital at Bridgewater, 74%; Massachusetts Alcohol and Substance Abuse Center at Plymouth, 57%; MCI, Shirley (minimum security), 84%; OCCC (minimum security), 64%; Boston Pre-Release, 55%; North Eastern Correctional Center, Concord, 68%; and Pondville Correctional Center, 78%.  For women's prisons, occupancy rates are as follows:  MCI Framingham, 37%; and South Middlesex Correctional Center, 31%.

[14] Based on operational capacity, the county houses of correction have the following rates of occupancy:  Barnstable County, 38%; Berkshire County, 36%; Bristol County, 55%; Dukes County, 28%; Essex: County, 77%; Franklin County, 52%; Hampden County, 51%; Hampshire County, 67%; Middlesex County, 54%; Norfolk County, 96%; Plymouth County, 51%; Suffolk County, 50%; and Worcester County, 62%.

members at two other facilities had tested positive; six additional individuals had symptoms of COVID. Three inmates were at hospitals, and the rest were housed in an isolated unit or the health services unit at the treatment center.

Correctional facilities report that they have developed plans in the event of a wider outbreak within their facilities, based on CDC and DPH guidelines. At least some of these plans contain contingencies for staffing shortages. For the most part, details on these plans have not been made available in the record or at argument before this court.

d. COVID-19 response in other jurisdictions. In response to the COVID-19 pandemic, a number of State courts throughout the country have instituted various forms of relief in order to reduce the number of incarcerated individuals in their States. The Chief Justice of the Supreme Court of South Carolina, for example, issued a memorandum to all judges and court staff directing that "[a]ny person charged with a non-capital crime shall be ordered released pending trial on his own recognizance without surety, unless an unreasonable danger to the community will result or the accused is an extreme flight risk." The Supreme Court of Washington issued an order that, among other measures, declares that the COVID-19 pandemic shall be presumed to be a "material change in circumstances" for the purposes of such motions for bail review if the individual has been

identified as part of a vulnerable or at-risk population by the CDC, and that the pandemic may constitute a material change in circumstances and "new information" for all others seeking amendment of a prior bail order. The order designates as priority matters all motions for pretrial release and bail modification, as well as plea hearings and sentencing hearings that will result in the anticipated release of a defendant within thirty days of the hearing.

The Chief Justice of the Supreme Court of Michigan issued an order and further guidance instructing judges to "take into careful consideration" the present state of the COVID-19 emergency in making pretrial release decisions, including setting bail and conditions of release or probation,. The Chief Justice later issued a statement directing that judges should release "far more people on their own recognizance" and "should use probation and treatment programs as jail alternatives." The statement called on judges and sheriffs to "use the statutory authority they have to reduce and suspend jail sentences for people who do not pose a public safety risk," and urged that "law enforcement should only arrest people and take them to jail if they pose an immediate threat to people in the community."

The Supreme Court of New Jersey ordered mediation in response to a petition from the State's Office of the Public Defender. The mediation resulted in a consent order that

suspends or commutes county jail sentences for low-risk inmates in light of the public health crisis, unless a State or county prosecutor objects to the release of a particular individual. If there is such an objections, a judge or special master will hold a hearing to determine if release would pose a significant risk to the safety of the inmate or the public.

2.  Relief sought.  All parties agree that a significant COVID-19 outbreak in Massachusetts correctional institutions would pose considerable risks to those who are incarcerated, correctional staff, and the broader community.  They disagree significantly about current conditions in correctional institutions, whether widespread release for some populations would be more harmful than beneficial, and the proper means by which to reduce the number of people held in custody, before trial and after conviction.

a.  Petitioners' arguments.  The petitioners ask this court to use its extraordinary superintendence power under G. L. c. 211, § 3, to take a number of unprecedented steps to reduce the number of people held in Massachusetts correctional facilities, both pretrial and postsentence.  These actions, they contend, are necessary practically, to save lives, and legally, to prevent what could become substantial and widespread violations of constitutional rights.

Specifically, the petitioners' brief describes potential threats to the rights of those held in State custody to be free from cruel and unusual punishment, embodied in the Eighth Amendment to the United States Constitution, and cruel or unusual punishment prohibited by art. 26. Those provisions require the Commonwealth to furnish conditions of confinement that do not create an unreasonable risk of future harm to inmate health and safety, an obligation the petitioners argue is effectively impossible to meet under conditions of global pandemic.

The petitioners argue as well that inaction could violate rights to due process of law, inscribed in the Fourteenth Amendment, and art. 12 of the Massachusetts Declaration of Rights. For pretrial detainees, the petitioners contend that the risk of infection and death constitutes punishment prior to adjudication, which is not reasonably related to a legitimate government interest, and therefore is inconsistent with due process. For those who have been convicted and sentenced, the petitioners argue that due process protections are violated when the deprivations suffered are "qualitatively different from the punishment characteristically suffered by a person convicted of crime." Vitek v. Jones, 445 U.S. 480, 493 (1980). Because the substantial threat of infection, serious illness, and death is not part of the sentence imposed on anyone in the Commonwealth,

the petitioners contend that inaction would constitute additional punishment without due process of law.

In their reply brief, and at argument before us, the petitioners state that they are not raising any constitutional claim at this time, and rather are pointing out the possibility of such violations if something is not done to mitigate the situation. The petitioners ask this court to reduce drastically (they suggest by a factor of one-half of the population currently held in custody) the number of individuals entering detention, held pretrial on unaffordable bail, and serving lawful sentences. They propose specific measures with respect to preventing individuals from entering State custody,[15] releasing those who are detained prior to trial,[16] and reducing

---

[15] To reduce the flow of individuals into the correctional system, the petitioners ask this court to: (1) order that risks associated with a COVID-19 outbreak be considered in bail hearings, probation revocation hearings, and determinations of dangerousness under G. L. c. 276, § 58A; (2) vacate bench warrants related to fines and fees; (3) vacate conditions of probation that automatically trigger probation violation proceedings upon an alleged violation; and (4) suspend pretrial and probation conditions incompatible with social distancing.

[16] For individuals being detained prior to trial, the petitioners seek the release of those held on unaffordable bail; held on a bail revocation for a technical violation of probation; those over sixty years of age; and those who have underlying health conditions that heighten their risk.

sentences, staying sentences, or paroling certain groups of individuals who are serving a sentence of imprisonment.[17]

To accomplish this latter set of releases, the petitioners suggest that this court amend Mass. R. Crim. P. 29, which allows judges to revise sentences within sixty days of imposition "if it appears that justice might not have been done," to eliminate the sixty-day time limit, so that judges, including the single justice of this court, thereby lawfully could reduce sentences due to COVID-19. Alternatively, they ask the court simply to order the releases using its purported authority under G. L. c. 211, § 3.

b. Respondents' arguments. While acknowledging the serious nature of the COVID-19 pandemic, the respondents take varying positions in response to it and the petitioners' arguments. To begin, they do not agree as to whether relief under G. L. c. 211, § 3, is appropriate. The district attorneys of the northern, northwestern, Suffolk, and Berkshire districts

---

[17] The petitioners ask this court to order the release of those serving sentences who are (1) eligible for parole and not serving a sentence for an offense under G. L. c. 265; (2) set to be released within six months; (3) reincarcerated after violations of parole or probation that did not involve a new offense; (4) over sixty years of age and not serving a sentence for an offense defined in G. L. c. 265; (5) suffering from a preexisting condition that heightens their risk of death from the virus; (6) eligible for medical parole; or (7) serving sentences in a house of correction for offenses other than those listed in G. L. c. 265.

agree with the petitioners that the risk of this pandemic is an unprecedented, deadly threat to incarcerated individuals, correctional officers, and civilian staff, and that extraordinary action is needed to address this rapidly-growing public health emergency expeditiously.  The Attorney General states that government officials within and outside the correctional system are committed to taking the steps necessary to protect the health and welfare of everyone within the criminal justice system, while acknowledging that the situation is rapidly evolving and that extraordinary relief under this court's superintendence powers may be appropriate in some circumstances.

The district attorneys for the Bristol, Cape & Islands, eastern, Hampden, middle, Norfolk, and Plymouth districts (seven district attorneys) state that they "are committed to taking appropriate steps consistent with public safety to mitigate the risks of infection in jails and prisons" for inmates and correctional staff, and that "such measures are already underway."  They assert that judges have been advised to take into account, and are doing so, COVID-19 risks in making bail determinations and deciding issues involving pretrial detention, court houses are staffed to handle and act upon all emergency motions for release, and correctional officials are acting

promptly and allowing "meritorious petitions for release based on medical vulnerability."

The seven district attorneys maintain as well that the petitioners' arguments disregard risks to public safety, particularly the physical and mental safety of victims and their families, especially victims of domestic violence, in addition to abrogating rights granted under the victims' bill of rights set forth in G. L. c. 253B. They contend that immediate release of some medically vulnerable individuals could pose a greater risk to the individual than remaining incarcerated with available medical care and treatment. They point out that seventy-three per cent of incarcerated males, and sixty-four per cent of incarcerated females are serving a sentence for a violent offense, and that their release into the community, particularly given the reduced levels of supervision currently available, where most supervision is by telephone and not in person, increases risks to the community and could overburden already overworked criminal justice systems.

The seven district attorneys also argue that relief under G. L. c. 211, § 3, is inappropriate, for several reasons. They contend that the petitioners have not shown that existing avenues of relief are inadequate. See Callahan v. Superior Court Dep't of the Trial Court, 432 Mass. 1023, 1023 (2000). They argue as well that the relief requested by the petitioners

is not available under G. L. c. 211, § 3, because the petitioners do not have standing to bring an individual claim under that statute. See Slama v. Attorney Gen., 384 Mass. 620, 624 (1981) ("Representative standing is generally limited to cases in which it is difficult or impossible for the actual rightholders to assert their claims"). In addition, they assert that the relief sought by the petitioners would amount to a suspension of laws, in violation of art. 30, and would be an attempt to exert this court's superintendence power over the executive branch, in violation of art. 30. See Commonwealth v. Donohue, 452 Mass. 256, 264 (2008). They argue as well that the petitioners are asking this court impermissibly to abrogate the provisions of numerous statutes on parole, revocation, commutation, compassionate release, and pardons. Similarly, the sheriffs' offices argue that the petitioners cannot obtain relief because they have not exhausted the administrative remedy of the grievance processes of the penal institutions. See G. L. c. 127, § 38F; 42 U.S.C. § 1997e(a).

The respondents also disagree on the substantive merits and the putative constitutional claims. The district attorney for the Suffolk district agrees with the petitioners that COVID-19 creates a situation in which the "evolving standards of decency that mark the progress of a maturing society" have been altered by COVID-19. See Michaud v. Sheriff of Essex County, 390 Mass.

523, 527 (1983). She states that appropriate physical distancing is impossible in a correctional facility, and that continued incarceration will constitute cruel and unusual punishment for some individuals.

Neither the Attorney General nor the district attorneys for the northern, northwestern, or Berkshire districts take a position on whether any constitutional rights would be violated. The district attorney for the Berkshire district adds that "all of the experts and government officials in Massachusetts have opined or suggested that the only hope of . . . reducing the number of deaths caused by COVID-19" is physical distancing and frequent handwashing and cleaning, which she states is "impracticable" in jails and prisons.

The seven district attorneys and the sheriffs argue that the Eighth Amendment and art. 26 claims lack merit because the petitioners have not shown "deliberate indifference" on the part of any prison or jail official. See Torres v. Commissioner of Correction, 427 Mass. 611, 613-614 (1998). They support this argument with affidavits from the DOC and the various sheriffs, detailing the steps taken by the correctional institutions to address the COVID-19 pandemic, summarized supra.

Based on their substantive and factual disagreements, the respondents propose contrasting dispositional requests. The seven district attorneys and the sheriffs ask that the petition

be denied in its entirety.  They argue that the steps already being taken towards reducing the population of incarcerated individuals are sufficient to address the advancing public health emergency.

The remaining district attorneys and the Attorney General ask that this court grant relief in the form of individualized review, with the goal of quickly reducing the incarcerated population.  They do not approve of the blanket release of classes of inmates, noting, as do the seven district attorneys, the public safety concerns regarding the release of those convicted of domestic violence or sexual assault; the dangers to released inmates and detainees who may not have a home, a medical provider, or a means to obtain substance abuse treatment; and the currently decreased availability of shelters and other social services.  The district attorneys for the Suffolk, northern, northwestern, and Berkshire districts ask that we create an emergency committee responsible for rapidly and collaboratively creating and implementing a policy to reduce the incarcerated population.  The district attorney for the Suffolk district argues that COVID-19 should be considered in various types of judicial decisions, and further requests that new bench warrants not issue for failure to appear or failure of indigent defendants to pay fines or fees.  The Attorney General suggests that we establish guidelines for the release of

pretrial detainees, and that we explore ways to allow relief for sentenced inmates, such as an amendment to Mass. R. Crim. P. 29.

3.  Discussion.  We agree that the situation is urgent and unprecedented, and that a reduction in the number of people who are held in custody is necessary.  We also agree with the Attorney General and the district attorneys that the process of reduction requires individualized determinations, on an expedited basis, and, in order to achieve the fastest possible reduction, should focus first on those who are detained pretrial who have not been charged with committing violent crimes. Having carefully examined the petitioners' arguments, we conclude that a modification of Rule 29 in the manner requested by the petitioners, such that judges could revise and revoke indefinitely valid sentences that have been imposed posttrial would result in a violation of art. 30 by allowing judges essentially to perform the functions of the parole board.  See, e.g., Commonwealth v. Ly, 450 Mass. 16, 22, (2007); Commonwealth v. Amirault, 415 Mass. 112, 116-117 (1993).  Absent a violation of constitutional rights, which the petitioners agree has not been established on this record, we also do not have authority under G. L. c. 211, § 3, to exercise supervision over parole, furlough, or clemency decisions by the DOC, the parole board, the sheriffs, and other members of the executive branch.

a.  _The court's superintendence authority_.  General Laws
c. 211, § 3, provides that the Supreme Judicial Court "shall
have general superintendence of all courts of inferior
jurisdiction to correct and prevent errors and abuses therein if
no other remedy is expressly provided."  The court's general
superintendence authority extends to "the administration of all
courts of inferior jurisdiction," and permits the issuance of
"writs, summonses and other process and such orders, directions
and rules as may be necessary or desirable for the furtherance
of justice."  In the past, we have exercised our extraordinary
superintendence authority to remedy matters of public interest
"that may cause further uncertainty within the courts"
(quotations omitted).  _Simmons_ v. _Clerk-Magistrate of the Boston
Div. of the Hous. Court Dep't_, 448 Mass. 57, 61 (2006).  See
_Bridgeman_ v. _District Attorney for the Suffolk District_, 471
Mass. 465, 474 (2015) (court utilized broad powers of
superintendence to address drug lab crisis affecting thousands
of potential defendants); _Lavallee_ v. _Justices in the Hampden
Superior Court_, 442 Mass. 228, 239 (2004) (relief under G. L.
c. 211, § 3, is necessary to remedy shortages of attorneys to
represent indigent defendants).

A petitioner seeking relief under G. L. c. 211, § 3, "must
present a substantial claim involving important substantive
rights, and demonstrate that any error cannot adequately be

remedied in the course of trial or normal appellate review." Lavallee, 442 Mass. at 233. See Costarelli v. Commonwealth, 374 Mass. 677, 679 (1978) (discretionary review under court's supervisory authority is "extraordinary" and only available "in the most exceptional circumstances"). Here, the petitioners claim that continued confinement in a jail or prison implicates concerns of fundamental fairness, and rights secured by the due process clauses of the Federal and State Constitutions (pretrial detainees) and the Eighth Amendment (inmates serving a sentence and pretrial detainees).

b. Pretrial detainees. We conclude, given the severity of the COVOID-19 pandemic, that the petitioners, as representatives of incarcerated individuals, have established standing to bring their claim, and an entitlement to relief. To establish representative standing, "[f]irst, the relationship of the litigant to the third party whose right the litigant seeks to assert must be such that the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue. Second, there must be some genuine obstacle that renders the third party unable to assert the allegedly affected right on his or her own behalf." Planned Parenthood League of Massachusetts, Inc. v. Bell, 424 Mass. 573, 578 (1997), citing Singleton v. Wulff, 428 U.S. 106, 113-118 (1976). "Representative standing is generally limited to cases in which

it is difficult or impossible for the actual rightholders to assert their claims" (citation omitted). Slama v. Attorney Gen., 384 Mass. 620, 624 (1981). Here, the relationship between the petitioners and the detainees and incarcerated individuals, now focused on having their clients released from custody, clearly is "inextricably bound up with the activity the litigant wishes to pursue," e.g., obtaining release through litigation in this court. In the present circumstances, it is difficult, at best, for incarcerated individuals to assert their claims; in particular, the enormous volume of claims, the urgency of expeditious hearings, the delays multiple individuals and attorneys have averred are occurring in holding hearings on motions for release, and the apparent belief by some trial judges that they have no authority to allow reconsideration of bail because detainees have not shown changed circumstances, all place severe obstacles in the path of any individual detainee seeking relief.

To effectuate such relief, pretrial detainees who are not charged with an offense listed in Appendix A, and who are not being held without bail subsequent to a determination of dangerousness under G. L. c. 276, § 58A, as well as individuals who are being held pending a final probation violation hearing, are entitled to expedited hearings on their motions for reconsideration of bail. These categories of pretrial detainees

shall be ordered released on personal recognizance unless the Commonwealth establishes, by a preponderance of the evidence, that release would result in an unreasonable danger to the community or that the individual presents a very high risk of flight.[18]

In making a determination whether release would not be appropriate, the judge should consider the totality of the circumstances, including (1) the risk of the individual's exposure to COVID-19 in custody; (2) whether the defendant, although not held in preventative detention pursuant to G. L. c. 276, § 58A, nonetheless would pose a safety risk to the victim and the victim's family members, witnesses, the community, or him- or herself if released; (3) whether the defendant is particularly vulnerable to COVID-19 due to a preexisting medical condition or advanced age; (4) for a defendant who is accused of violating a condition of probation, whether the alleged violation is a new criminal offense or a technical violation; and (5) the defendant's release plan.[19]

---

[18] This ruling does not preclude other pretrial detainees, who have been charged with one of the excluded offenses enumerated in Appendix A, from seeking reconsideration of bail on the ground of changed circumstances, which we have concluded exist as a matter of law. These individuals, however, are not entitled to a rebuttable presumption of release.

[19] Of course, those individuals who have tested positive or are symptomatic for COVID-19, or who are in quarantine due to having been in close contact with someone else who has tested

i. <u>Process to be followed</u>. Each sheriff in charge of a house of correction shall inform the special master, CPCS, the district attorney for the district in which the institution is located, the clerks of the Superior, District, Boston Municipal, and Juvenile courts in that district, and the probation service daily of the identity of each person who is detained awaiting trial in the sheriff's facility, in reports setting forth the information specified in Appendix B.[20] The defense bar and the district attorney in each district shall make good faith efforts to reach agreement with respect to the release of as many pretrial detainees as possible, so that agreed-upon motions for reconsideration of bail may be presented to trial court judges.[21]

Based on the daily census reports to be provided by the sheriffs, CPCS shall facilitate the filing of any motions for reconsideration of the amount of bail or conditions of release, including contacting counsel for each detainee. Defense counsel shall be permitted promptly to convene video or teleconferences with their clients; the sheriffs' offices and DOC are to work

---

positive, must remain in isolation or quarantine and would not be eligible for release during those periods.

[20] In addition, the DOC shall furnish the special master daily reports of inmate counts and rates of COVID-19 cases at each facility, as explained in Appendix B.

[21] Upon request by a defendant, the sheriffs also are required timely to provide the defendant with his or her requested medical records.

with the defense bar to facilitate such communications.  The district attorneys should make every effort to inform any victim of the motion, to be consistent with statutory requirements, to the extent practical.  In light of the public health emergency posed by COVID-19, the inability of the Commonwealth to provide the type of notice called for by the victims' rights statute, G. L. c. 258B, shall not be grounds for the continued detention of a detainee otherwise entitled to release in accordance with this decision.

Hearings on motions for reconsideration of bail will take place by videoconference or teleconference no later than two business days after the filing of the motion.  A decision on the motion shall be rendered promptly.  To enable expeditious processing of such motions, each relevant court shall establish a designated session to hear motions for reconsideration of bail and release; a primary judge, a first backup, and a second backup judge shall be assigned to each session.  Individuals who are aggrieved by the denial of a motion for reconsideration of bail may seek review under G. L. c. 211, § 3, from the single justice of the county court.

c.  New arrests.  We are persuaded that the limitations that courts in other jurisdictions have placed on new detentions and incarcerations are compelling, and we adopt similar measures to reduce as far as possible the influx of new individuals into

correctional institutions. Following any arrest during the COVID-19 state of emergency, and until further order of this court, a judicial officer should consider the risk that an arrestee either may contract COVID-19 while detained, or may infect others in a correctional institution, as a factor in determining whether bail is needed as a means to assure the individual's appearance before the court. Given the high risk posed by COVID-19 for people who are more than sixty years of age or who suffer from a high-risk condition as defined by the CDC, the age and health of an arrestee should be factored into such a bail determination. This is an additional, temporary consideration beyond those imposed by the relevant bail statutes, G. L. c. 276, §§ 57 and 58, and by due process principles. See Brangan v. Commonwealth, 477 Mass. 691, 702-705 (2017); Querubin v. Commonwealth, 440 Mass. 108, 113-114 (2003). A judge also must consider the same factors in deciding whether to detain an individual pending a revocation hearing based on an alleged violation of probation.

d. Incarcerated individuals serving sentences. The petitioners also seek release of multiple groups of individuals who are currently serving sentences of incarceration. They suggest, inter alia, that, in order to do so, we eliminate the requirement in Rule 29 that motions to revise or revoke a sentence be filed within sixty days of the imposition of the

sentence or the issuance of the rescript.  See Mass. R. Crim. P. 29 (a) (2).

"As a general matter, Massachusetts courts have recognized that 'it is within the inherent authority of a trial judge to "reconsider decisions made on the road to final judgment."'" Commonwealth v. Charles, 466 Mass. 63, 83 (2013), quoting Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 401 (2003).  See Commonwealth v. Cronk, 396 Mass. 194, 196, (1985), and cases cited ("While the Massachusetts Rules of Criminal Procedure do not expressly permit a judge to rehear a matter, no policy prohibits reconsideration of an order or judgment in appropriate circumstances").  That authority is limited once final judgment has entered.

Our broad power of superintendence over the courts does not grant us the authority to authorize courts to revise or revoke defendants' custodial sentences, to stay the execution of sentence, or to order their temporary release unless a defendant (1) has moved under Mass. R. Crim. P. 29, within sixty days after imposition of sentence or the issuance of a decision on all pending appeals, to revise or revoke his or her sentence, (2) has appealed the conviction or sentence and the appeal remains pending, or (3) has moved for a new trial under Mass. R. Crim. P. 30.

Rule 29 allows revisions of a final sentence within sixty days of its issuance or sixty days of the issuance of a decision on any appeal from the sentence or from the underlying conviction. Rule 29 "recognizes that '[o]ccasions inevitably will occur where a conscientious judge, after reflection or upon receipt of new probation reports or other information, will feel that he [or she] has been too harsh or has failed to give due weight to mitigating factors which properly he should have taken into account." Commonwealth v. Rodriguez, 461 Mass. 256, 260 (2012), quoting Commonwealth v. McCulloch, 450 Mass. 483, 487 (2008). "In such cases, a judge under rule 29 may 'reconsider the sentence he [or she] has imposed and determine, in light of the facts as they existed at the time of sentencing, whether the sentence was just." Rodriguez, supra, quoting McCulloch, supra. "A judge, therefore, is not barred from reducing a sentence the judge has imposed until the time limits established in rule 29 to revise or revoke a sentence have expired." Rodriguez, supra. Absent an assertion of an illegal sentence, such review is time-limited both as to the filing of a motion for review and the issuance of a judge's decision within a "reasonable" time. See Commonwealth v. Layne, 386 Mass. 291, 295-296 (1982), and cases cited.

The petitioners do not address the requirement of Rule 29 that the reduction be based on a sentencing judge's later

determination (with or without a hearing) that "justice may not have been done" due to some factor present at the time of sentencing, or the reasons for that requirement.  See Layne, 386 Mass. at 295-296, and cases cited.  They apparently discount the requirement that review under Rule 29 (a) is to "permit a judge to reconsider the sentence he [or she] has imposed and determine, in light of the facts as they existed at the time of sentencing, whether the sentence was just [emphasis in original].[22]  Commonwealth v. Amirault, 415 Mass. 112, 117 (1993), quoting Commonwealth v. Sitko, 372 Mass. 305, 313-314 (1977).

"The granting of parole, [on the other hand,] is a discretionary act of the parole board."  Amirault, 415 Mass. at 116-117, citing Lanier v. Massachusetts Parole Bd., 396 Mass. 1018, 1018 (1986).  "It is a function of the executive branch of government."  Amirault, supra, citing Stewart v. Commonwealth,

---

[22] In support of their argument that this court modify Rule 29 to remove any period of limitation on a judge's authority to revise and revoke a valid sentence, the petitioners point to Commonwealth v. Tejeda, 481 Mass. 794, 797 (2019). That case, however, does not advance their position.  In Tejeda, we reiterated that "we have repeatedly and unequivocally held that a judge may not take into account conduct of the defendant that occurs subsequent to the original sentence" (citations omitted). Id.  Although we indicated that the judge in that case could consider, post sentencing, that a more culpable coventurer received a lesser sentence than had the defendant, we emphasized that "the grounds for each sentence were known" at the time of defendant's trial. Id.

413 Mass. 664, 669 (1992), and Baxter v. Commonwealth, 359 Mass. 175, 179 (1971).  "By allowing a motion to revise or revoke sentences when the parole board does not act in accordance with a judge's expectations, the judge is interfering with the executive function.  The judge cannot nullify the discretionary actions of the parole board."  Amirault, supra, and cases cited.

Rule 29 is designed to protect the separation of powers as set forth in art. 30.  See Clark, petitioner, 34 Mass. App. Ct. 191, 195 (1993). "The execution of sentences according to standing laws is an attribute of the executive department of government."  Sheehan, petitioner, 254 Mass. 342, 345 (1926).  To attempt to "revise," i.e., cut short, sentences in the current situation would be to perform the function of the parole board, thereby "effectively usurp[ing] the decision-making authority constitutionally allocated to the executive branch."  See Stewart, 413 Mass. at 669, quoting Commonwealth v. Gordon, 410 Mass. 498, 501 (1991); Amirault, 415 Mass. at 117 ("[T]he judge imposed sentences that he noted were within the guidelines.  In considering requests for revision of those sentences under rule 29 the judge may not consider the denial of parole").

While we cannot order that relief be granted to sentenced inmates who have been serving a legal sentence, and who have not timely moved to revise or revoke that sentence, mechanisms to

allow various forms of relief for sentenced inmates exist within
the executive branch. The parole board, for example, has
authority to release individuals who have become eligible for
parole because they have reached their "minimum term of
sentence." See G. L. c. 127, § 133. An inmate in a house of
correction can receive early parole consideration and be
released up to sixty days prior to the minimum term based on
"any . . . reason that the Parole Board determines is
sufficiently compelling." 120 Code Mass. Regs. § 200.10 (2017).
Once an inmate reaches eligibility, the parole board must hold a
hearing to decide whether to grant the inmate a parole permit.
See G. L. c. 127, § 133A; 120 Code Mass. Regs. § 301.01 (2017).
See also G. L. c. 127, § 134 (allowing employees other than
parole board members to conduct hearings for inmates at houses
of correction).[23] The parole board "shall only grant a parole
permit if they are of the opinion that there is a reasonable
probability that . . . the offender will live and remain at
liberty without violating the law and that release is not
incompatible with the welfare of society." 120 Code Mass. Regs.
§ 300.04 (2017). See G. L. c. 127, § 130. If denied parole,
inmates generally are entitled to a rehearing after either one

---

[23] The parole board reported at oral argument before us that
it has made arrangements to hold hearings via video
conferencing, and indeed was conducting two such hearings on the
day of argument.

or five years, but the board may hold an earlier rehearing at its discretion. See G. L. c. 127, § 133A; 120 Code Mass. Regs. § 301.01.

The parole board nonetheless reported at oral argument that it has made no efforts to accelerate the scheduling of parole hearings. The board reports that currently approximately 300 individuals have been deemed appropriate for release and have been awarded parole through the ordinary process, but have yet to be granted parole permits that would result in their actual release from custody because the board has not reduced what the board says is a standard delay in preparing for release.[24] During normal times, the two-week delay the board states is standard might be reasonable. But these are not normal times. We urge the board to expedite release of these previously-approved individuals, as well as to expedite hearings on other inmates who are eligible for parole.

e. Constitutional claims. As stated, while the petitioners argued in their initial brief that the failure to

---

[24] The parole board stated at oral argument that release generally is delayed for two weeks after a favorable decision while the board finalizes the inmate's housing plan and contacts any victims or law enforcement agencies as required by statute. See G. L. c 258B, § 3; G. L. c. 127, § 133A; 120 Code Mass. Regs. § 301.06(3)(a) (2017). The parole board should use every effort to expedite the several stages of this process as far as reasonably possible so as to reduce the over-all number of incarcerated inmates as quickly as possible.

release incarcerated individuals violated the Eighth Amendment's prohibition on cruel and unusual punishment, and the failure to release pretrial detainees violated due process protections under the Fourteenth Amendment and art. 26, in their reply brief and at oral argument they asserted that they are not pursuing such claims.  Accordingly, we do not consider their constitutional claims.  See Commonwealth v. AdonSoto, 475 Mass. 497, 506 (2016), quoting Commonwealth v. Raposo, 453 Mass. 739, 743 (2009) ("We do not decide constitutional questions unless they must necessarily be reached").

4.  Conclusion.  Due to the crisis engendered by the COVID-19 pandemic, pretrial detainees who have not been charged with an excluded offense as set forth in Appendix A are entitled to a rebuttable presumption of release on personal recognizance, and a hearing within two business days of filing a motion for reconsideration of bail and release, in accordance with the procedures set forth in this opinion.

The special master shall report weekly to this court, as set forth in this opinion, in order to facilitate any further response necessary as a result of this rapidly-evolving situation.

So ordered.

Appendix A.

EXCLUDED OFFENSES

1. Any crime punishable by imprisonment in a State prison that (i) has as an element the use, attempted use or threatened use of physical force or a deadly weapon against the person of another; (ii) is burglary, extortion, arson, or kidnapping; or (iii) involves the use of explosives. See G. L. c. 140, § 21; G. L. c. 276, § 58A. This includes, but is not limited to, the following offenses: murder (G. L. c. 265, § 1); manslaughter (G. L. c. 265, § 13); mayhem (G. L. c. 265, § 14); assault with the intent to murder or maim (G. L. c. 265, § 15); assault and battery by means of a dangerous weapon (G. L. c. 265, §§ 15A, 15B, 15C); strangulation (G. L. c. 265, § 15D); assault and battery or attempt by discharge of firearm (G. L. c. 265, §§ 15E, 15F); attempted murder (G. L. c. 265, § 16); armed robbery (G. L. c. 265, § 17); assault with the intent to rob or murder (G. L. c. 265, § 18); armed assault in a dwelling (G. L. c. 265, § 18A); use of a firearm in the commission of a felony (G. L. c. 265, § 18B); home invasion (G. L. c. 265, § 18C); unarmed robbery (G. L. c. 265, § 19); and stealing by confinement (G. L. c. 265, § 21);

2. Any crime involving allegations of domestic violence, including assault or assault and battery on a family member (G. L. c. 265, § 13M); violation of an abuse prevention order

under the provisions of G. L. c. 209A, and all violations of harassment prevention orders issued pursuant to G. L. c. 258E;

3. Intimidation of witnesses, jurors, or persons furnishing information in connection with criminal proceedings (G. L. c. 268, § 13B);

4. Any third or subsequent violation of driving while under the influence (G. L. c. 90, § 24) within ten years of the previous conviction for such violation;

5. Motor vehicle homicide or manslaughter while operating a motor vehicle (G. L. c. 90, § 24G, and G. L. c. 265 § 13 1/2);

6. All offenses punishable by a minimum mandatory sentence involving illegal possession of a firearm, machine gun, sawed off shotgun, large capacity weapon, or feeding device (G. L. c. 269, § 10);

7. The following sex offenses: aggravated rape (G. L. c. 277, § 39); rape (G. L. c. 265, § 22); rape of a child under the age of sixteen with force (G. L. c. 265, § 22A); aggravated rape of a child under the age of sixteen with force (G. L. c. 265, § 22B); rape and abuse of a child (G. L. c. 265, § 23); aggravated rape and abuse of a child (G. L. c. 265, § 23A); assault with intent to commit rape (G. L. c. 265, § 24); assault of a child with intent to commit rape (G. L. c. 265, § 24B); kidnapping of a child (G. L. c. 265, § 26); indecent assault and battery on a child under the age of fourteen (G. L. c. 265,

§ 13B); aggravated indecent assault and battery on a child under the age of fourteen (G. L. c. 265, § 13B 1/2); indecent assault and battery on an intellectually disabled person (G. L. c. 265, § 13F); indecent assault and battery on a person age fourteen or over (G. L. c. 265, § 13H); enticing a child under the age of sixteen for the purposes of committing a crime (G. L. c. 265, § 26C), enticing a child under the age of eighteen via electronic communication to engage in prostitution, human trafficking or commercial sexual activity (G. L. c. 265, § 26D); trafficking of persons for sexual servitude (G. L. c. 265, § 50); a second or subsequent violation of human trafficking for sexual servitude (G. L. c. 265, § 52); enticing away a person for prostitution or sexual intercourse (G. L. c. 272, § 2); drugging persons for sexual intercourse (G. L. c. 272, § 3); inducing a minor into prostitution (G. L. c. 272, § 4A); living off or sharing earnings of a minor prostitute (G. L. c. 272, § 4B); incestuous marriage or intercourse (G. L. c. 272, § 17); posing or exhibiting a child in a state of nudity (G. L. c. 272, § 29A); and unnatural and lascivious acts with a child under sixteen (G. L. c. 272, § 35A);

8.  Any violation involving trafficking in cocaine or heroin in excess of 200 grams (G. L. c. 94C, § 32 [b] [4], [c] [4]; or trafficking in fentanyl or carafentanil G. L. c. 94C, § 32 [c 1/2], [c 3/4]); and

9.  All attempts, conspiracies, or accessories after the fact of the aforementioned offenses.

APPENDIX B.

REPORTING REQUIREMENTS

1.  In order to effectuate the purposes of this decision and the underlying public health goals, while the COVID-19 state of emergency remains in effect, the court asks the DOC and each sheriff to provide daily reports to the special master, the probation service, the district attorneys, and CPCS, identifying:

a.  The over-all inmate population;

b.  The number of COVID-19 tests and number of positive results for all inmates, correctional officers, or other staff members, including contactors; and

c.  The number of inmates who have been released pursuant to the procedures or guidance set forth in this decision.

2.  In addition to the above, the sheriffs also shall provide the special master, the probation service, the district attorneys, and CPCS daily census reports containing the names of pretrial detainees being held at their facilities, and the offenses with which they have been charged.